STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
RICHARD BIEGENWALD, DEFENDANT-APPELLANT.

Argued February 5, 1985—Decided March 5, 1987.

16

*Glen J. Vida,* Union, argued the cause for appellant.

*James Fagen,* Assistant Prosecutor, argued the cause for respondent (*John A. Kaye,* Monmouth County Prosecutor, attorney).

*Boris Moczula,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Irwin I. Kimmelman,* Former Attorney General, attorney).

### Table of Contents

| | | |
|---|---|---|
| | Introduction | 18 |
| I. | Facts | 18 |
| II. | Constitutionality of Death Penalty *Per Se* and of *N.J.S.A.* 2C:11–3 | 25 |
| III. | Pretrial Issues | 26 |
| | A. *Voir Dire* | 26 |
| | 1. Challenges for Cause at Side Bar | 26 |
| | 2. Counsel *Voir Dire* Participation | 27 |
| | 3. Excuse of Jurors for Hardship | 30 |
| | B. Publicity and Venue | 30 |
| | C. Prosecutorial Misconduct | 38 |
| IV. | Reasonable Doubt Charge in Guilt Phase | 41 |
| V. | Sentencing Issues | 45 |
| | A. Jury Waiver | 45 |
| | B. Aggravating Factor c(4)(c) as Applied to Defendant | 48 |
| | C. Weighing Aggravating and Mitigating Factors | 53 |
| VI. | Resentencing | 67 |
| | Conclusion | 72 |

The opinion of the Court was delivered by

WILENTZ, C.J.

Defendant, Richard Biegenwald, was convicted of murder and sentenced to death by a Monmouth County jury and judge in December 1983. He appeals directly to this Court as of right. *See R.* 2:2–1(a)(3). We affirm defendant's murder conviction. Because the trial court failed to instruct the jury properly in the sentencing phase, however, we must reverse the sentence of death and remand for a new sentencing proceeding.

## I.

### Facts

On the night of August 27, 1982, eighteen-year-old Anna Olesiewicz and a friend, Denise Hunter, drove from Camden to Neptune City planning to stay at Denise's uncle's house. They went over to the Asbury Park boardwalk. Olesiewicz and Hunter sat on a boardwalk bench to listen to the music coming out of a nearby club. Hunter left for a short while to use a bathroom, and when she returned, she found that Olesiewicz was no longer on the boardwalk bench where she had left her. After she failed to find Olesiewicz, Hunter returned to her uncle's home and filed a missing persons report the next morning.

On January 14, 1983, the skeleton of a female body was discovered in a vacant lot behind a fast food restaurant on Route 35 in Ocean Township. By matching dental charts, authorities identified the body as that of Anna Olesiewicz. When the body was discovered, it was clothed in the items Olesiewicz was last seen wearing—blue jeans and a dark shirt—except that a black and gold ring was missing from her

finger. In the skull were four bullet holes, and three of the bullets were lodged within the skull. Testimony at trial indicated that the victim died as a result of the bullet wounds. It was estimated that death had occurred several months prior to the autopsy. Inadequate tissue remained to enable blood alcohol or chemical tests to be performed on the body.

One week after the body was discovered, twenty-two-year-old Theresa Smith, who had shared an apartment with the defendant, forty-two-year-old Richard Biegenwald, and his wife, Diane, came to the police and recounted a story implicating Biegenwald in the shooting. This story was essentially the same as that to which she testified later at Biegenwald's trial.

Smith had previously worked as a waitress with Diane Biegenwald and lived with the Biegenwalds from June through October 1982 in a multi-apartment house in Asbury Park. Shortly after she moved in with the Biegenwalds, Smith and the defendant became friends.

Smith told how during the course of their relationship she became the defendant's protege and he encouraged her to find and kill a "victim" to prove to him that she was "tough." They discussed that Smith should murder "Betsy," Smith's co-worker. On Friday, August 27, the date of Anna Olesiewicz's disappearance, Smith drove around shore towns with Betsy, having contemplated and discussed with Biegenwald a plan to murder Betsy. Smith, however, called the defendant and told him that she could not go through with the murder plan, and she returned alone to the Asbury Park apartment to sleep. Smith testified that Biegenwald awakened her later that same night, although she did not recall why. Unable to return to sleep, she went to the kitchen, and, looking out the window toward the driveway, saw a "shadow of a body" sitting in the car that Biegenwald had given to her. She returned to sleep.

At the end of the next day Biegenwald took Smith into the garage where he lifted a mattress to show Smith a female body

in unzipped jeans, a dark shirt and no shoes. Smith did not see the face because a large green plastic bag covered the head and was secured around the neck. Biegenwald asked Smith to touch the body—to "pick her leg up" and tell him how it felt. The defendant told Smith he had shot the victim in the head after meeting her on the boardwalk, telling her he had marijuana, and taking her back to the house. Biegenwald told Smith that Olesiewicz had been intended to be Smith's first victim but when he had tried to waken Smith while the victim was still alive, Smith would not get up. Biegenwald removed from the victim's finger a black and gold ring which one month later he gave to Smith. The next day Biegenwald and Dherran Fitzgerald, a friend of the defendant, who lived in the neighboring apartment, disposed of the body behind the fast food restaurant.

The police arrested the residents of the Asbury Park house— Richard and Diane Biegenwald, Dherran Fitzgerald, his girlfriend, and her daughter—based on Smith's statement. In the basement of Biegenwald's apartment the police discovered three weapons, ammunition, and controlled substances later determined to have been stolen from the hospital where Diane Biegenwald worked. The murder weapon was found in Fitzgerald's apartment as was an extensive cache of weapons. The black and gold ring missing from the victim's finger was discovered in Diane Biegenwald's jewelry box. Smith testified that after wearing the ring for several weeks she gave it to Diane Biegenwald. The only ammunition found that fit the .22 Short, the murder weapon, was discovered in a bag near the basement room where Biegenwald slept. The ammunition sales registry at a sporting goods store in Ocean Township showed that both Diane Biegenwald and Dherran Fitzgerald had purchased .22 Short ammunition.

The defendant was indicted by a Monmouth County Grand Jury on May 4, 1983, on ten counts: (1) the murder of Anna

Olesiewicz (*N.J.S.A.* 2C:11–3a(1), (2))[1]; (2) felony murder (Sec. a(3)); (3) armed robbery (*N.J.S.A.* 2C:15–1a); (4) possession of a weapon for an unlawful purpose (*N.J.S.A.* 2C:39–4a); (5) unlawful possession of a weapon (*N.J.S.A.* 2C:39–5b); (6) possession of a weapon by a convicted felon (*N.J.S.A.* 2C:39–7); (7) possession of marijuana (*N.J.S.A.* 24:21–20a(4)); (8) possession of a controlled dangerous substance with intent to distribute (*N.J.S.A.* 24:21–19a(1)); (9) possession of a controlled dangerous substance (*N.J.S.A.* 24:21–20a(1)); and (10) unlawful possession of a number of weapons (*N.J.S.A.* 2C:39–5b, 5d). The sixth count was severed before trial. Biegenwald pleaded not guilty to all counts.

Fitzgerald was initially also charged with the murder of Anna Olesiewicz but this charge was dismissed in exchange for Fitzgerald's testimony against Biegenwald.

The case received extensive pretrial publicity in the local press. The defendant was linked to possibly four or five previous local murders, most of teenaged girls. Local and regional papers covered the Biegenwald arrest, investigation, and trial extensively, nicknaming him the "thrill killer" because, it was reported, he killed only for pleasure.

Defendant's attorneys moved for a change of venue, claiming the extensive publicity would not allow Biegenwald a fair trial in the local area. On July 29 this motion was denied, as was a motion to dismiss the indictment based on defendant's claim that the prosecutor's actions constituted prosecutorial misconduct. The trial court ordered both sides to cease commenting to the press regarding the indicted matters or others pending indictment.

---

[1]*N.J.S.A.* 2C:11–3, containing the Code's murder provisions, consisted of five subsections, (a) to (e), at the time of these crimes and their trials. The death penalty provisions are found in subsections (c) to (e). For convenience, in referring to these provisions we shall, for instance, use Sec. c(1) to designate *N.J.S.A.* 2C:11–3c(1). When cited in its totality, *N.J.S.A.* 2C:11–3 will hereinafter be referred to as "the Act."

The trial itself, which began on November 14, was extensively covered in local news reports. The day before the trial, news reports discussed Biegenwald's prior conviction for murder, repeated the prosecutor's statements that he killed Olesiewicz because "he wanted to see someone die that night," and linked Biegenwald to five area murders.[2]

The venue motion was renewed at the start of the trial. The trial court initially stated that it would refuse to grant the motion unless 250 jurors indicated their inability to be impartial. Counsel did not renew the venue motion after the close of *voir dire*.

During *voir dire* the trial court at first sought to determine whether potential jurors' general views about capital punishment made them unqualified to sit in a capital case. The court initially asked general questions concerning the potential jurors' exposure to pretrial publicity and refused a defense request to inquire into specific details recalled from the public accounts. Defense counsel objected that the narrow scope of *voir dire* permitted the seating of jurors who would consider defendant's other crimes. In response, the trial court began to question those jurors whose answers indicated knowledge of defendant's background as to the extent of such knowledge. Of the eighty-eight venirepersons questioned about pretrial publicity, the court dismissed thirty-five of the forty-seven who indicated that they recalled specific details of other murders connected to defendant. The court excused only those prospective jurors who specifically indicated that they could not be impartial. Of the twelve remaining jurors who had been exposed to substantial publicity, four were seated over defense

---

[2]Biegenwald was subsequently indicted for four other murders: Maria Cial-lella, allegedly murdered on October 31, 1981; Debra Osborne, on April 7, 1982; Betsy Bacon, on November 20, 1982; and William Ward, on September 21, 1982. *See State v. Biegenwald,* 96 *N.J.* 630, 633 (1984) (per curiam). Biegenwald was found guilty of the murder of William Ward on February 16, 1984, and sentenced to life imprisonment. *Id.* at 633–34.

challenges for cause. Defense counsel used peremptory challenges to remove these jurors. Every challenge for cause by the defendant was denied, and the court refused to hear challenges for cause at side bar. Defendant's counsel exhausted all twenty peremptory challenges before the final jury was seated.

Several jurors reported to the trial court that while waiting to be questioned, they had discussed defendant's case as well as the news reports of his previous conviction and alleged prior murders. The court then instructed the first two jury panels not to discuss the case. When the final jury was selected, at least one member had been identified as a juror who had discussed the case while awaiting *voir dire.*

At trial the State's main witnesses were Theresa Smith and Dherran Fitzgerald. Smith testified to what she had told the police in January. Fitzgerald testified about his friendship with Biegenwald, statements made by defendant to him about the murder, and the disposal of the body behind the fast food restaurant.

Biegenwald's defense was that Fitzgerald, an admitted contract killer, had murdered Anna Olesiewicz. Defendant presented the testimony of three inmates at Trenton State Prison who told essentially the same story. They claimed that Fitzgerald, in prison prior to negotiating his plea arrangement, on seeing news headlines about the murder had bragged that he had killed Olesiewicz. Each of Biegenwald's witnesses had initiated contact with defense counsel through the mail, having learned of the case in prison. All three said that although defendant did not initiate contact with the witness, the defendant had given them the name and address of his lawyer.

Defendant was found guilty of five counts: murder, possession of a weapon for an unlawful purpose, two counts of possession of a weapon without a permit, and possession of a controlled substance.

Defendant signed a written waiver relinquishing his right to a jury in the penalty phase. However, the prosecutor refused to consent to the waiver, and as his consent is required by

Section c(1), sentencing was conducted by the same jury that had determined guilt.

At the sentencing trial, the prosecutor introduced as an aggravating factor evidence of defendant's 1959 murder conviction, for which he had served seventeen or eighteen years in prison. Sec. c(4)(a). The prosecution also asked that the jury consider as an aggravating factor that the murder of Anna Olesiewicz was "outrageously or wantonly vile, horrible or inhuman in that it involved ... an aggravated battery to the victim." Sec. c(4)(c).

Defendant sought to establish three mitigating factors: c(5)(a), that defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution; c(5)(d), that his ability to appreciate the wrongfulness of his conduct or to conform it to the requirements of the law was significantly impaired as a result of mental disease or defect but not to a degree sufficient to constitute a defense to prosecution; and c(5)(h), any other unspecified factor that was relevant to his character or record or to the circumstances of the offense. Defendant introduced testimony from a forensic psychiatrist that Biegenwald suffered from a severe personality disorder known as anti-social personality with paranoid traits. The psychiatrist explained that Biegenwald was abused as a child and was institutionalized at the age of eight, diagnosed as schizophrenic and given twenty electro-convulsive shock treatments. Biegenwald subsequently entered a state hospital. On returning home he was beaten again by his father, stole from his mother, and routinely escaped from his house for days at a time. At age eighteen he was convicted of a murder committed while robbing a store, for which he served the seventeen or eighteen year prison term. A psychiatrist who had initially been called by the defense in preparation of an insanity defense but had advised counsel that the defendant was not legally insane testified that Biegenwald lacked the emotional capacity to appreciate the wrongfulness of his act or to conform his behavior to the law.

The court instructed the jury that aggravating factors must be found beyond a reasonable doubt but that the jury had to be "satisfied" only that a mitigating factor existed. It instructed that all of the mitigating factors together had to be weighed against each of the aggravating factors alone. It did not instruct that the jury had to be convinced beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors, but charged that if each aggravating factor was *not outweighed* by the combined mitigating factors, death would be imposed. After a request for clarification, the court explained that the conditions listed in Section c(4)(c) were to be read in the disjunctive. It explained that to find that aggravating factor c(4)(c) existed, the jury had to find that the attack "involved either torture or conduct indicating a depraved mind or that the attack was so savagely outrageously cruel or violent that the adjectives wantonly, vile or horrible or inhuman are justified." It did not explain what constitutes an aggravated battery.

The jury found both aggravating factors offered by the State to exist beyond a reasonable doubt. The jury found two mitigating factors—that the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as a result of mental disease or defect, and that another unspecified factor existed that was relevant to the defendant's character or record or to the circumstances of the offense. The jury did not find that the defendant was under the influence of extreme mental or emotional disturbance. Finally, the jury found that neither aggravating factor was outweighed by the combined mitigating factors and, accordingly, the court sentenced defendant to death.

## II.

### Constitutionality of Death Penalty *Per Se* and of *N.J.S.A.* 2C:11–3

Defendant argues that any death penalty law, and hence the Act, inflicts cruel and unusual punishment forbidden by the

eighth amendment of the federal Constitution and Article I, paragraph 12 of the New Jersey Constitution. For the reasons given in *State v. Ramseur*, 106 *N.J.* 123 (1987), also decided today, we reject this contention.

## III.

### Pretrial Issues

A. *Voir Dire*

1. Challenges for Cause at Side Bar

Defendant challenges as reversible error the trial court's ruling that required challenges for cause to be asserted and explained in open court, in the presence of the challenged juror, rather than at side bar. Defendant contends that the practical effect of the trial court's ruling was to compel defense counsel to use some of his peremptory challenges to remove jurors who otherwise could have harbored prejudice against defendant.

Defendant cites three instances in which this ruling was applied by the trial court. However, in the case of the first such ruling, the request to assert the challenge at side bar occurred after the challenge was denied. The second instance involved a challenge for cause asserted in open court immediately after a side bar conference. Here, grounds for the challenge were described as being "based upon the statement we just had at side bar," so that the challenged juror did not hear the grounds for the challenge. Only the third example clearly involved a challenge for cause that the trial court required counsel to assert in the juror's presence, rather than at side bar.[3]

In *State v. Smith*, 55 *N.J.* 476, 483, *cert.* den., 400 *U.S.* 949, 91 *S.Ct.* 232, 27 *L.Ed.*2d 256 (1970), we held that the decision to hear challenges for cause at side bar or in open court is one

---

[3]During the balance of the jury *voir dire,* the trial court permitted challenges for cause to be asserted at side bar.

within the discretion of the trial court. There, counsel initially challenged a juror for cause at the bench. Counsel then asserted his next challenge in open court, claiming later that this was at the court's direction. After counsel made subsequent challenges for cause without requesting permission to approach the bench, he informed the court that he felt compelled to challenge peremptorily because of the court's refusal to hear challenges for cause at side bar. The trial court denied having made such a ruling, and permitted later challenges for cause to be made at side bar. We found no improper exercise of the court's discretion. *Id.*

■ Similarly, we are unable to conclude here that the isolated instance during *voir dire* in which counsel was requested to challenge for cause in open court was so mistaken an exercise of discretion as to warrant reversal. We are not persuaded that every juror unsuccessfully challenged for cause is inevitably biased against the party asserting the challenge. Nor are we convinced that the peremptory challenge subsequently expended against the challenged juror would not have been asserted had the challenge for cause been advanced at side bar rather than in open court.

■ We are of the view that challenges for cause based on bias or partiality should be asserted at side bar particularly in capital cases. The minimal inconvenience and delay entailed by this procedure are clearly offset by the undesirability of a prospective juror knowing that his presence on the jury is objectionable to one party. In this case, however, the ruling to which defendant objects had a minimal impact on the jury selection process and appears to be confined to one juror, later challenged peremptorily by defendant. Under the circumstances, we do not find that the trial court's ruling had the capacity to deprive defendant of a fair trial.

2. Counsel *Voir Dire* Participation

Defendant contends that the trial court's refusal to permit defense counsel to interrogate the jury during *voir dire* was

prejudicial error. He argues that neither our decision in *State v. Manley*, 54 *N.J.* 259 (1969), nor *Rule* 1:8–3(a)[4] should be construed to prohibit attorney-conducted *voir dire* in capital cases.

In *State v. Manley, supra*, 54 *N.J.* 259, defendant was indicted for first-degree murder. On appeal from his conviction for second-degree murder, defense counsel claimed trial error because of the trial court's refusal to permit him to propound questions during jury *voir dire* concerning defendant's prior criminal conviction. In sustaining the conviction, this Court announced its adoption of the predecessor of *Rule* 1:8–3(a), which was intended to return control of jury *voir dire* to the trial court and vest in the trial court discretion to permit or restrict supplemental questioning by counsel. *Id.* at 281–83. Justice Francis, writing for a unanimous Court, expressed in no uncertain terms the reason for the new rule:

> In many instances it has taken as long or longer to empanel a jury as to try the case. The impression is inescapable that the aim of counsel is no longer *exclusion* of unfit or partial or biased jurors. It has become the *selection* of a jury as favorable to the party's point of view as indoctrination through the medium of questions on assumed facts and rules of law can accomplish.
> [*Id.* at 281 (emphasis in original).]

In *Manley, supra*, 54 *N.J.* at 283, we modified our holding in *State v. Sullivan*, 43 *N.J.* 209, 239–40 (1964), *cert.* den., 382 *U.S.* 990, 86 *S.Ct.* 564, 15 *L.Ed.*2d 477 (1966), a death penalty case that had permitted more *voir dire* examination by counsel. The compelling policy reasons for court-controlled *voir dire*, the *Manley* opinion's "call[ ] for a much more guarded discretion than previously announced in *State v. Sullivan, supra*, 43 *N.J.* [at] 239–40," 54 *N.J.* at 283, a capital case, and the text of *Rule*

---

[4]*Rule* 1:8–3(a) (1983) provides:

> For the purpose of determining whether a challenge should be interposed, the court shall interrogate the prospective jurors in the box after the required number are drawn without placing them under oath. The parties or their attorneys may supplement the court's interrogation in its discretion. At trials of crimes punishable by death ..., the examination shall be made of each juror individually, as his name is drawn, and under oath.

1:8–3(a) persuade us that the holding in *Manley* was intended to apply, and should apply, in death penalty cases. We note also that the Appellate Division has expressly considered and rejected the contention that *State v. Manley, supra,* 54 *N.J.* 259, is inapplicable to capital cases. *State v. Howard,* 192 *N.J.Super.* 571 (1983).

Our present Court rule is intended to see that *voir dire* is conducted to the extent reasonably possible by the court. The trial court is given discretion to permit counsel to supplement the court's interrogation of jurors by submitting questions to the court and, where the court approves, by additional personal questioning by counsel. *See R.*1:8–3(a); *Manley, supra,* 54 *N.J.* at 282–83. In this case, following the customary practice, the trial court required counsel to submit to it proposed questions for the juror then being interrogated. The court then determined whether or not the question submitted would be propounded to the juror. No instances have been cited to demonstrate that the trial court abused its discretion in refusing to allow questions to jurors.

We reiterate our comments in *State v. Williams,* 93 *N.J.* 39 (1983), as to the desirability of searching *voir dire* interrogation where juror bias is an issue. There we noted that

[a]n important, indeed critical, means for dealing with potential and latent bias is the voir dire. The court should consider the efficacy of more exhaustive and searching voir dire examinations. The court in conducting the voir dire should be particularly responsive to the requests of counsel regarding the examination of prospective jurors as to potential bias.

[*Id.* at 68 (footnotes omitted).]

Although in some instances the trial court's interrogation was more general and less searching than that requested by counsel, our independent review of the record reveals that the overall scope and quality of the *voir dire* was sufficiently thorough and probing to assure the selection of an impartial jury. We hold that the trial court's refusal to permit the *voir dire* interrogation to be conducted by counsel was within the limits of our decision in *State v. Manley, supra,* 54 *N.J.* 259,

and of *Rule* 1:8–3(a), because both the *Manley* decision and the Rule are applicable to capital cases. However, we note that in capital cases trial courts should be especially sensitive to permitting attorneys to conduct some *voir dire*.

### 3. Excuse of Jurors for Hardship

■ We also note and reject defendant's contention that the trial court overestimated the length of the trial, causing "many well-educated and working-class people" to ask to be excused from jury service. The trial court on November 14 announced to the jury pool was that the trial "will probably go ... up until Christmas." Accordingly, the trial court excused those jurors whose jobs might be jeopardized or whose personal circumstances were such that jury service for an extended period would be a financial hardship. In fact, jury *voir dire* occupied the week of November 14, the trial commenced on November 28, after a recess during Thanksgiving week, and lasted nine days, ending on December 8.

There is no suggestion that the trial court deliberately or unreasonably excluded from jury service a cognizable class of jurors in violation of defendant's sixth amendment rights, *see Thiel v. Southern Pac. Co.*, 328 *U.S.* 217, 221–25, 66 *S.Ct.* 984, 986–88, 90 *L.Ed.* 1181, 1185–87 (1946), or that the jury selection procedure resulted in a substantial underrepresentation of a constitutionally cognizable group, *see Castaneda v. Partida*, 430 *U.S.* 482, 494, 97 *S.Ct.* 1272, 1280, 51 *L.Ed.*2d 498, 510 (1977). Although the trial court's estimate of the length of trial proved to be incorrect, it was hardly unreasonable or inappropriate in view of the State's extended witness list and the anticipated length of the jury *voir dire*. We find no error either in the trial court's attempt to estimate the length of trial or in its determination to exclude jurors unable to serve in a protracted trial.

### B. Publicity and Venue

It is undisputed that there was extensive pretrial publicity concerning the defendant in newspapers distributed in Mon-

mouth County, particularly during April and May of 1983. A number of articles linked the defendant to other homicides and disclosed his prior murder conviction. Front page articles in the *Asbury Park Press* included photographs of the police digging to locate bodies, maps to gravesites, interviews with families of victims, and photographs of the defendant in handcuffs. Although articles concerning defendant appeared with greatest frequency in the *Asbury Park Press*, a newspaper widely read in Monmouth County, there was also significant publicity in the *Star Ledger*, *The New York Times*, the *Daily News*, the *New York Post*, the *Record* (Bergen County), the *Atlantic City Press*, the *Trentonian*, the *Daily Register* (Monmouth County), the *Home News* (Middlesex County), and the *Philadelphia Inquirer*, as well as substantial radio and television publicity.

The prosecutor was quoted and seen regularly in the news reports of the case. He established a hotline to receive information about the defendant and the murders and held press conferences. He was accompanied by 200 reporters during the search for bodies of defendant's alleged victims on Staten Island, New York. When speaking with the press the prosecutor repeatedly assumed defendant's guilt and also stated that defendant killed only for pleasure. One article attributed to the prosecutor the observation that defendant had murdered Olesiewicz and the others because "he wanted to see someone die" on those nights.

After May 1983, publicity about the case generally subsided. In July defendant moved for a change of venue on the ground that the extensive pretrial publicity made it unlikely he could receive a fair trial in Monmouth County. The assignment judge denied the change of venue motion without prejudice to its renewal at the time of trial. At the same time, he adjourned the September trial date for two months and barred any further public comment by counsel concerning the case or other related matters pending indictment.

The day before the trial began, the *Asbury Park Press* carried a front page article on the upcoming trial, featuring a picture of the defendant, discussing his prior conviction in 1959 for murder, repeating the prosecutor's statements about lack of motive, and linking the defendant to five area murders. Thereafter, press coverage of the jury *voir dire* and the trial continued daily. A few jurors were observed reading newspaper accounts of the trial in the jury assembly room before they were called for *voir dire*. We note that the trial court instructed all jurors not to read anything about the case.

It is axiomatic that a criminal defendant's right to a fair trial requires that he be tried before a jury panel not tainted by prejudice. *Irvin v. Dowd*, 366 *U.S.* 717, 722, 81 *S.Ct.* 1639, 1642, 6 *L.Ed.*2d 751, 755 (1961). We have emphasized the importance, particularly in capital cases, of the trial court's responsibility "to preserve the integrity of the jury and minimize the danger that prejudice will infiltrate the adjudicatory process. . . ." *State v. Williams, supra,* 93 *N.J.* at 63.

In criminal cases attended by widespread and inflammatory publicity, various trial management techniques can be employed to assure that the defendant's right to an impartial jury is not compromised. One available option is a change in venue. Other means of protecting the defendant's constitutional rights include the use of searching *voir dire* examinations, the impaneling of "foreign jurors" to augment the pool of eligible jurors in the vicinage, adjournment of the trial date, and restraints on public comments by participants in the trial. *R.* 3:14-2, -3; *State v. Williams, supra,* 93 *N.J.* at 67-68; *State v. Van Duyne,* 43 *N.J.* 369, 388-89 (1964), *cert.* den., 380 *U.S.* 987, 85 *S.Ct.* 1359, 14 *L.Ed.*2d 279 (1965).

Defendant contends that the pretrial publicity was so prejudicial that no relief short of a change of venue was adequate to assure a fair trial. He therefore maintains that denial of the motion to change venue was an abuse of discretion and de-

prived him of his constitutional right to trial by an impartial jury.

We previously required a defendant seeking a change of venue to establish by "clear and convincing proof that a fair and impartial trial cannot be had before a jury of the county where the indictment was found." *State v. Wise,* 19 *N.J.* 59, 73–74 (1955). The cases that followed *Wise* made clear that few defendants succeeded in their efforts to establish a need to change venue. *See State v. Belton,* 60 *N.J.* 103, 107–08 (1972); *State v. Mayberry,* 52 *N.J.* 413, 420 (1968), *cert.* den., 393 *U.S.* 1043, 89 *S.Ct.* 673, 21 *L.Ed.*2d 593 (1969); *State v. Gallicchio,* 51 *N.J.* 313, 318, *cert.* den., 393 *U.S.* 912, 89 *S.Ct.* 233, 21 *L.Ed.* 2d 198 (1968); *State v. Ravenell,* 43 *N.J.* 171, 180–81 (1964), *cert.* den., 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965). Accordingly, in 1983 in a capital case we modified the defendant's burden, conferring on trial courts the discretion to change venue where it is "necessary to overcome the realistic likelihood of prejudice from pretrial publicity." *State v. Williams, supra,* 93 *N.J.* at 67–68 n. 13; *see State v. Bey,* 96 *N.J.* 625, 630, clarified, 97 *N.J.* 666 (1984).

In determining whether a realistic likelihood of prejudice exists in a particular case, we agree with the distinction recognized by the federal courts between cases in which the trial atmosphere is so corrupted by publicity that prejudice may be presumed, *Sheppard v. Maxwell,* 384 *U.S.* 333, 352, 86 *S.Ct.* 1507, 1516, 16 *L.Ed.*2d 600, 614 (1966); *Estes v. Texas,* 381 *U.S.* 532, 542–44, 85 *S.Ct.* 1628, 1632–34, 14 *L.Ed.*2d 543, 550–51 (1965); *Turner v. Louisiana,* 379 *U.S.* 466, 472–73, 85 *S.Ct.* 546, 549–50, 13 *L.Ed.*2d 424, 429 (1965); *Rideau v. Louisiana,* 373 *U.S.* 723, 727, 83 *S.Ct.* 1417, 1419, 10 *L.Ed.*2d 663, 665–66 (1963); *Marshall v. United States,* 360 *U.S.* 310, 312–13, 79 *S.Ct.* 1171, 1172–73, 3 *L.Ed.*2d 1250, 1252 (1959) (per curiam), and cases in which pretrial publicity, while extensive, is less intrusive, making the determinative issue the actual effect of the publicity on the impartiality of the jury panel. *Patton v.*

*Yount,* 467 *U.S.* 1025, 1032–35, 104 *S.Ct.* 2885, 2889–91, 81 *L.Ed.*2d 847, 854–56 (1984); *Dobbert v. Florida,* 432 *U.S.* 282, 301–03, 97 *S.Ct.* 2290, 2302–03, 53 *L.Ed.*2d 344, 361–62 (1977); *Murphy v. Florida,* 421 *U.S.* 794, 800–03, 95 *S.Ct.* 2031, 2036–38, 44 *L.Ed.*2d 589, 595–97 (1975); *Irvin v. Dowd, supra,* 366 *U.S.* at 723–28, 81 *S.Ct.* at 1642–46, 6 *L.Ed.*2d at 756–59; *Stroble v. California,* 343 *U.S.* 181, 193–95, 72 *S.Ct.* 599, 605–06, 96 *L.Ed.* 872, 882–83 (1952); *see Coleman v. Kemp,* 778 *F.*2d 1487, 1489 (11th Cir.1985) ("There are two standards which guide analysis of this question, the 'actual prejudice' standard and the 'presumed prejudice' standard."), *cert.* den., —— *U.S.* ——, 106 *S.Ct.* 2289, 90 *L.Ed.*2d 730 (1986).

Illustrative of the cases in which prejudice is presumed is *Rideau v. Louisiana, supra,* 373 *U.S.* 723, 83 *S.Ct.* 1417, 10 *L.Ed.*2d 663, where the defendant's confession of bank robbery, kidnapping, and murder was televised on three occasions two months before the jury was selected and seen by a substantial number of residents in the parish where defendant was to be tried. The Court reversed the denial of defendant's motion to change venue, observing that "[a]ny subsequent court proceeding in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Id.* at 726, 83 *S.Ct.* at 1419, 10 *L.Ed.*2d at 665.

In contrast, in *Murphy v. Florida, supra,* 421 *U.S.* 794, 95 *S.Ct.* 2031, 44 *L.Ed.*2d 589, defendant, referred to by the national media as "Murph the Surf," had attained notoriety for his complicity in the theft of the Star of India sapphire from a New York museum. His 1970 robbery prosecution in Dade County, Florida, was preceded by widespread publicity during 1968 and 1969, but the publicity largely ceased seven months before jury selection. In rejecting defendant's contention that the pretrial publicity required a change of the venue for trial, the Court distinguished the intrusiveness of the publicity from that found in *Rideau, supra,* 373 *U.S.* 723, 83 *S.Ct.* 1417, 10 *L.Ed.*2d 663; *Sheppard v. Maxwell, supra,* 384 *U.S.* 333, 86

*S.Ct.* 1507, 16 *L.Ed.*2d 600; and *Estes v. Texas, supra,* 381 *U.S.* 532, 85 *S.Ct.* 1628, 14 *L.Ed.*2d 543. The Court observed:

The proceedings in [those] cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. They cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process. To resolve this case, we must turn, therefore, to any indications in the totality of circumstances that petitioner's trial was not fundamentally fair.

[421 *U.S.* at 799, 95 *S.Ct.* at 2036, 44 *L.Ed.*2d at 594.]

■ It is abundantly clear to us that this is not a case in which the trial court was required to presume the existence of prejudice prior to the jury *voir dire.* The extensive pretrial publicity was concentrated in April and May, 1983. In addition to prohibiting further public comment by counsel, the trial court adjourned the trial date until mid-November, allowing nearly six months to permit the impact of the publicity to subside. As the Court stated in *Patton v. Yount, supra,* 467 *U.S.* 1025, 104 *S.Ct.* 2885, 81 *L.Ed.*2d 847, rejecting defendant's argument that his retrial, four years after his first highly publicized trial, was tainted by the earlier publicity, "the passage of time ... can be a highly relevant fact ... [that] rebuts any presumption of partiality or prejudice...." *Id.* at 1035, 104 *S.Ct.* at 2891, 81 *L.Ed.*2d at 856.

It has frequently been noted that pervasive pretrial publicity does not necessarily preclude the likelihood of an impartial jury. We observed in *State v. Williams, supra,* that

there is also some reason to believe that even in highly publicized cases the venire will contain many individuals who have not been exposed to the publicity or who, if exposed, are only faintly aware of the nature of the case. *See, e.g., United States v. Ehrlichman,* 546 *F.*2d 910, 916–17 n. 8 (D.C.Cir.1976) [*cert.* den., 429 *U.S.* 1120, 97 *S.Ct.* 1155, 51 *L.Ed.*2d 570 (1977)]; *United States v. Haldeman,* 559 *F.*2d 31, 61–63 (D.C.Cir.1976) [*cert.* den. *sub nom. Mitchell v. United States,* 431 *U.S.* 933, 97 *S.Ct.* 2641, 53 *L.Ed.*2d 250 (1977)]; *State v. Joyce,* 160 *N.J.Super.* 419, 430 (Law Div.1978).

[93 *N.J.* at 66 n. 10.]

■ We therefore conclude that under the circumstances of this case, the appropriate inquiry is whether the jury selection

process actually resulted in a fair and impartial jury. As we stated in *State v. Van Duyne, supra,* this inquiry requires us to examine the results of the jury *voir dire.*

[A]n appellate tribunal is likewise under a duty to make an independent evaluation of the facts and circumstances and of the juror's *voir dire* examination. It should determine for itself whether the pretrial newspaper stories are so pervasive and so prejudicial, or the juror's protestation of unaffected impartiality after reading them so unconvincing or doubtful that a new trial should be ordered.

[43 *N.J.* at 386.]

Jury selection in this case commenced on November 14, 1983, and continued for five consecutive days. A total of ninety-five jurors were questioned, of whom seven were excused by the court for personal reasons. Of forty-six jurors excused for cause, thirty-five indicated that their familiarity with the case would affect their ability to serve impartially. Six of the forty-six were excused because of their views concerning capital punishment, four because of personal experiences or relationships and one because of discussions she overheard in the jury room. All of defendant's challenges for cause were denied. The prosecution used six peremptory challenges, while the defense used all twenty of its peremptory challenges. Only one juror, an alternate, was seated after the defendant's peremptory challenges were exhausted.

The sixteen impaneled jurors, responding to the court's interrogation, indicated that they had encountered little or no publicity regarding the case. Several of the trial jurors stated that they had never heard of the defendant before coming to court. We find that a substantial segment of the jury panel subjected to *voir dire* unequivocally and credibly demonstrated that the pretrial publicity had passed them by, and we are satisfied that the jury that was impaneled was as a whole impartial.

As noted above, the standard governing the trial court's discretion on a venue change motion is whether the change is necessary to overcome the realistic likelihood of prejudice resulting from pretrial publicity. The dissent appears to agree that there are various options available to the trial court to

dispel that likelihood (*e.g.*, change of venue, postponement of trial, *voir dire*, foreign jurors, gag order), and that the ultimate test of whether it was dispelled is the *voir dire* and its results. Although the dissent contends it was not dispelled, the fact is that defendant on this appeal makes no complaint about the *voir dire* (except for the trial court's initial refusal to hear challenges at side bar and to allow individual attorney questioning of jurors) or about the trial court's rulings on his challenges for cause. Those rulings are highly discretionary. Assuming, nevertheless, that any was erroneous, application of the plain error rule, *sua sponte*, would be totally inappropriate given the satisfactory jury that ultimately was impanelled. Furthermore, the trial court told defense counsel, who had previously moved for change of venue, that it would not entertain the motion until after the *voir dire;* significantly no such motion was thereafter made. The reason must be that the impanelled jury in fact was satisfactory. That jury did not include anyone who recalled having previously read anything about other murders or a prior murder conviction. The only impanelled juror who had such knowledge (of alleged prior murders, but not the prior conviction) heard it from others on the panel. Her *voir dire* convinced the trial court—and apparently the defense, for she was not challenged for cause and no objection is now made to her serving—that she could disregard what she heard and serve impartially. Except for her, none of the jurors whose *voir dire* is excerpted in the dissent's Appendix actually served on the jury.

We do not dispute defendant's contention that this case was the subject of widespread and inflammatory publicity throughout the region during the spring of 1983. However, our independent review of the record of the jury *voir dire* impels us to conclude that a significant portion of the jury array was relatively unexposed to pretrial publicity and that the jurors impaneled constituted a fair and impartial trial jury.

## C. Prosecutorial Misconduct

██ Defendant claims that he was denied an impartial jury as a result of the massive pretrial publicity which included and was encouraged by inflammatory statements made by the Monmouth County Prosecutor. The prosecutor arranged several press briefings in April, May and June 1983, during which he discussed the murders for which he was seeking to indict Biegenwald. The prosecutor gave the names, ages and addresses of the victims. He assumed defendant's guilt, and commented on his motive, events surrounding the crimes, and portions of the State's evidence. Among the prosecutor's statements were that defendant committed the murders "because he wanted to see someone die" on those nights; that defendant shot Ms. Olesiewicz "for the sheer pleasure of seeing her die"; and that Biegenwald was a "perverted, sick individual." On July 29, 1983, the trial court denied defendant's motion to dismiss the indictment on the basis of prosecutorial misconduct.

*Disciplinary Rule* 7–107(A), (B) of the Code of Professional Responsibility states, in pertinent part:

(A) A lawyer participating in or associated with the investigation of a criminal matter shall not make or participate in making an extrajudicial statement that he expects to be disseminated by means of public communication and that does more than state without elaboration:

(1) Information contained in a public record relating to the matter.

(2) That the investigation is in progress.

(3) The general scope of the investigation including a description of the offense and, if permitted by law, the identity of the victim.

(4) A request for assistance in apprehending a suspect or assistance in other matters and the information necessary thereto.

(5) A warning to the public of any dangers.

(B) A lawyer or law firm associated with the prosecution or defense of a criminal matter shall not ... make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that relates to:

(1) The character, reputation, or prior criminal record (including arrests, indictments, or other charges of crime) of the accused....

(6) Any opinion as to the guilt or innocence of the accused, the evidence, or the merits of the case.

This Court has held that *Disciplinary Rule* 7–107(B)(6) "prohibits an attorney involved in an ongoing criminal trial from making extrajudicial comments concerning the guilt or innocence of a criminal defendant or the quality of the evidence or the merits of the case when such remarks are ... *reasonably likely* to interfere with a fair trial." *In re Rachmiel*, 90 *N.J.* 646, 657 (1982) (emphasis added). The disciplinary rule creates a "rebuttable presumption that statements on these topics are reasonably likely to affect the proceedings." *Id.* (citing *Chicago Council of Lawyers v. Bauer*, 522 *F.*2d 242, 251 (7th Cir.1975), *cert.* den. *sub nom. Cunningham v. Chicago Council of Lawyers*, 427 *U.S.* 912, 96 *S.Ct.* 3201, 49 *L.Ed.*2d 1204 (1976)).

The State argues that the prosecutor's comments were permissible because they disclosed only the results of an ongoing investigation. For support, it relies on *Disciplinary Rule* 7–107(A)(3), which authorizes unelaborated statements by a prosecutor as to "[t]he general scope of the investigation including a description of the offense and, if permitted by law, the identity of the victim." We find this argument to be specious in the context of the inflammatory pretrial comments by the prosecutor in this case. The prosecutor's public statements that defendant murdered Olesiewicz "for the sheer pleasure of seeing her die" or "because he wanted to see someone die that night" can hardly be justified as disclosures warranted by the "general scope of the investigation including a description of the offense...." *DR* 7–107(A)(3). Rather, such statements are clearly expressions of opinion on "the evidence, or the merits of the case," unquestionably proscribed by *Disciplinary Rule* 7–107(B)(6). Particularly in a case like this one, characterized by feverish media interest and broad publicity throughout the state, such comments by the prosecutor are highly inappropriate and inconsistent with his duty to insure that justice is done. *See State v. Johnson*, 65 *N.J.* 388, 392 (1974); *State v. Farrell*, 61 *N.J.* 99, 104 (1972).

We here reiterate our firm position as stated in *State v. Ramseur, supra,* 106 *N.J.* 123, that prosecutors in capital cases have a special obligation to seek justice and to not simply convict, and that we will scrupulously review conduct that falls short of this high standard:

> Prosecutors in capital cases are hereby on notice that in the future, this Court will not hesitate to refer on its own motion possible violations of the special ethical rules governing prosecutors to the appropriate district ethics committee for disciplinary action. We are well aware that within the legal profession the prosecutor's double calling—to represent vigorously the state's interest in law enforcement and at the same time help assure that the accused is treated fairly and that justice is done—is uniquely challenging. That challenge is what makes the prosecutor's mission such a difficult one and such an honorable one. A prosecutor willing to engage in proscribed conduct to obtain a conviction in a capital case betrays his oath in both its respects. Not only does he scoff at rather than seek justice, he also represents the state poorly. Because death is a uniquely harsh sanction, this Court of necessity will more readily find prejudice resulting from prosecutorial misconduct in a capital case than in other criminal matters; prosecutors who fail to take seriously their particularly stringent ethical obligations in capital cases thus strongly risk postponing, and even jeopardizing, the enforcement of the law. We are confident that our prosecutors will be equal to this ethical challenge, but we also stand ready to take whatever action is required to remedy any abuses.
>
> [*Id.* at 323–324.]

However, "[p]rosecutorial misconduct is not ground for reversal of a criminal conviction unless the conduct was so egregious that it deprived defendant of a fair trial." *Id.* at 322. Despite our strong disapproval of the prosecutor's statements, we are persuaded that these statements, occurring as they did in April and May of 1983, did not "substantially prejudice the defendant's fundamental right to have a jury fairly evaluate the merits of his defense." [5] *State v. Bucanis,* 26 *N.J.* 45, 56, *cert.* den., 357 *U.S.* 910, 78 *S.Ct.* 1157, 2 *L.Ed.*2d 1160 (1958). As we noted in connection with the change of venue motion, the pretrial publicity subsided in June, and the trial court's July 1983 order

---

[5] Our references to prosecutorial misconduct are not intended to suggest that this Court has adjudicated an ethical offense on the part of the prosecutor. Issues of that kind can be determined only in disciplinary proceedings. Our conclusions are based on the facts that appear before us on this record and are limited to this case only.

barring statements by counsel and adjourning the trial date until November further served to mitigate the adverse impact of the prosecutor's comments on the jury panel. We conclude, based on our careful review of the jury *voir dire*, that the interval between the prosecutor's offending statements and the actual trial was sufficient to dilute their prejudicial effect and preserve defendant's right to trial by an impartial jury.

## IV.

### Reasonable Doubt Charge in Guilt Phase

Defendant next contends that the trial court's charge regarding the prosecution's obligation to establish guilt beyond a reasonable doubt was improper and constitutes reversible error. He focuses on the following from the charge:

What do we mean by reasonable doubt?

The expression is very basic and really very simple.

A reasonable doubt is a doubt based on reason, reasoning processes.

Defendant does not construct any argument based on the quoted language, apparently content to rest on the implication that it is somehow wrong. Not confronted with any specific claim of error, we will not reach out to manufacture one.

We would be remiss, however, were we not to caution our trial courts against using any charge that has a tendency to "understate[ ]" or "trivialize the awesome duty of the jury to determine whether the defendant's guilt was proved beyond a reasonable doubt." *Commonwealth v. Ferreira*, 373 *Mass.* 116, 364 *N.E.*2d 1264, 1272 (1977). Any instruction that suggests that the concept of reasonable doubt is "simple" may run the risk of detracting from both the seriousness of the decision and the State's burden of proof. Because "[t]he degree of certainty required to convict is unique to the criminal law," 364 *N.E.*2d at 1273, we would discourage the resort to any language that tends to minimize the indispensable nature of the "reasonable doubt" standard. *See In re Winship*, 397 *U.S.*

358, 364, 90 *S.Ct.* 1068, 1072, 25 *L.Ed.*2d 368, 375 (1970); *United States v. Pine*, 609 *F.*2d 106, 108 (3d Cir.1979).

Turning to Biegenwald's specific claims of error, they are that the charge (1) "did not ask whether the jurors had any doubt existing in their minds," (2) "did not ask whether or not [the jurors] had given full and impartial consideration to all the evidence," and (3) "did not comment upon the evidence or lack of evidence given by the prosecution nor did it call the jury's attention to the same." None of the contentions has merit.

In pertinent part the trial court's charge on reasonable doubt was as follows:

> What do we mean by a reasonable doubt?
>
> The expression is very basic and really very simple.
>
> A reasonable doubt is a doubt based on reason, reasoning processes. A reasonable doubt then is not a doubt which is based on guesswork. It is not a doubt based on a hunch.
>
> It is not a doubt based on some sort of idle speculation.
>
> It is not a mere possible doubt.
>
> The test is not proof beyond any possible doubt.
>
> That is not the test.
>
> It's not any imaginary doubt, because you may well know, everything in life, I suppose everything in human affairs is subject to some possible or imaginary doubt.
>
> That is not the test.
>
> The test is not proof beyond a possible doubt.
>
> The test is proof beyond a reasonable doubt.
>
> The law does not require absolute certainty, because as Benjamin Franklin said, other than death and taxes, there are very few things in life that are absolutely certain, so that is not the test, reasonable doubt.
>
> Proof beyond a reasonable doubt is the test.
>
> What is a reasonable doubt?
>
> By way of other words to express the same concept, a reasonable doubt is an honest and reasonable uncertainty as to the guilt of the defendant which exists in your minds after you have given *full and impartial consideration to all of the evidence in the case.* . . .
>
> In essence, *it's a doubt which a reasonable thinking person has after carefully weighing all of the evidence in the case.* (Emphasis added.)

Whereas standing alone the definition of reasonable doubt as "a doubt based on reason, reasoning processes," might well be deemed inadequate, when read in conjunction with the entire

charge it had no capacity to mislead the jury. Challenged portions of a jury charge must not be read in isolation; rather, "the charge should be examined as a whole to determine its overall effect." *State v. Wilbely,* 63 *N.J.* 420, 422 (1973). Included in the portion of the charge quoted above is the court's definition of reasonable doubt as an "honest and reasonable uncertainty as to the guilt of the defendant which exists in your minds after you have given full and impartial consideration to all of the evidence in the case." This definition, coupled with the additional comments of the court, fully and accurately apprised the jury of the State's burden of proof beyond a reasonable doubt. Read in context the challenged portion does not constitute error.

Proceeding to defendant's next point, we note that had the trial court charged the jurors, as defendant contends was required, that a finding of guilt had to be based on the absence of "any doubt existing in their minds," the instruction would have been manifestly incorrect. We need not tarry on the point longer than to repeat a basic principle of criminal law: the prosecution must establish all elements of the crime beyond *reasonable* doubt, *e.g., In re Winship, supra,* 397 *U.S.* at 363, 90 *S.Ct.* at 1072, 25 *L.Ed.*2d at 375; *State v. Bess,* 53 *N.J.* 10, 18 (1968), rather than beyond any possible or conceivable doubt.

Defendant's next argument, that the court failed to instruct the jury on its obligation to give "full and impartial consideration to all the evidence," is simply not supported by the record. One need look no further for refutation than the underscored portion of the charge above; and if one does look further, one will find that the charge is replete with admonitions to the effect that the jurors are to decide the case on the basis of all the evidence.

Finally, defendant complains of the trial court's failure to have commented on the evidence—an objection not made at trial and hence one not eligible for appellate review "unless it is of such a nature as to have been clearly capable of producing

an unjust result," *R.* 2:10–2, that is, "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." *State v. Hock,* 54 *N.J.* 526, 538 (1969), *cert.* den., 399 *U.S.* 930, 90 *S.Ct.* 2254, 26 *L.Ed.*2d 797 (1970) (quoted in *State v. Latimore,* 197 *N.J.Super.* 197, 213 (App.Div.1984), certif. den., 101 *N.J.* 328 (1985)). In any event we know of no authority—nor does defendant point to any—standing for the principle, constitutional or otherwise, that a court is compelled to make such comment. *See Stevens v. Roettger,* 22 *N.J.Super.* 64, 66 (App.Div.1952) ("It is elementary that a trial judge is not obliged to charge matters or comment with regard to the facts of the case ...").

The issue of the trial court's comment on the evidence usually arises in a different context, one in which a defendant argues that the court should *not* have recited the facts of the case. In those situations our decisions have uniformly recognized the *right* of a trial court to comment on the evidence, *e.g., State v. Mayberry, supra,* 52 *N.J.* at 439–40; *State v. Laws,* 50 *N.J.* 159, 176–77 (1967), reargued, 51 *N.J.* 494, *cert.* den., 393 *U.S.* 971, 89 *S.Ct.* 408, 21 *L.Ed.*2d 384 (1968), and "oftentimes" even the *duty* to do so, *Mayberry, supra,* 52 *N.J.* at 439–40; *Laws, supra,* 50 *N.J.* 176–77. Ordinarily, however, trial courts comment on evidence only sparingly, if at all, the better to assure that the ultimate determination of facts is made by the jury. *See* L. Arnold, 32 New Jersey Practice, *Criminal Practice and Procedure* § 981 (2d ed. 1980). The rare situation in which a trial court exercises its discretion to delve into the facts is usually one in which the evidence is complex or the potential for confusion is great; and when that situation occurs, any comment must be designed to avoid unduly influencing or otherwise invading the province of the jury. In this case, the evidence was not overly complex or confusing, and the trial

court was well within its discretion in choosing not to comment on the evidence. We find no error.

## V.

### Sentencing Issues

#### A. Jury Waiver

Biegenwald claims reversible error in the trial court's denial of "defendant's fundamental constitutional right to trial by jury" during the sentencing proceeding under the Act. He moved before the trial court to waive the jury in the sentencing phase of his trial, claiming that "the massive publicity generated by his trial" precluded his receiving a fair and just sentence. (We note that under this point heading defendant does not make a "pretrial publicity" argument, which is made in another context. *See supra* at 30–37.)

Although defendant signed a written waiver relinquishing his right to a jury trial for the separate sentencing phase, the prosecutor refused to consent to a non-jury trial. Under the Act, such consent is required in order for defendant to waive sentencing by jury. Section c(1) of the Act states:

> The court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or pursuant to the provisions of subsection b. of this section. Where the defendant has been tried by a jury, the proceeding shall be conducted by the judge who presided at the trial and before the jury which determined the defendant's guilt except that, for good cause, the court may discharge that jury and conduct the proceeding before a jury empaneled for the purpose of the proceeding. Where the defendant has entered a plea of guilty or has been tried without a jury, the proceeding shall be conducted by the judge who accepted the defendant's plea or who determined the defendant's guilt and before a jury empaneled for the purpose of the proceeding. On motion of the defendant *and with consent of the prosecuting attorney the court may conduct a proceeding without a jury.* (Emphasis added.)

In addition, *Rule* 1:8–1(a) specifically requires the consent of the prosecutor as a condition to a defendant's waiver of a jury in the sentencing phase of death penalty proceedings.

The prosecutor's stated reason was that a jury that had witnessed defendant's trial, had determined his guilt, and was intimately familiar with the facts of the case, would be in the best position to determine, on the basis of the evidence, whether the factual prerequisites for imposition of the death penalty had been established.

In denying defendant's motion for a non-jury sentencing proceeding, the trial court observed that even if the prosecutor had consented, the court would not have acceded to the waiver. The court's "basic reason" for this position was a belief that in capital sentencing the collective wisdom of the jury is preferable to a determination by a single judge.[6]

On this appeal defendant argues that because the sentencing phase is a "separate and distinct criminal proceeding[ ], a defendant must be afforded a constitutional right to waive a jury trial, which right is not subject to the unilateral rejection of a prosecuting attorney." The opportunity for prosecutorial veto of the waiver of jury trial, claims defendant, violates his "constitutional right to trial by jury, which of necessity embodies the consequential right to waive this protection"—a protection "long established for [defendant's] benefit." He does so without providing any authority for the proposition that he has a right to waive a jury.

We disagree with defendant's sixth amendment claims. The case law is clear on this matter. In *Singer v. United States,* 380 *U.S.* 24, 85 *S.Ct.* 783, 13 *L.Ed.*2d 630 (1965), involving a prosecution for violation of a mail fraud statute, petitioner, arguing in favor of his unrestricted right to waive a jury and submit to a non-jury trial, made contentions similar to those

---

[6]The statement by the court that it would not allow the jury to be waived even if the State were to give its consent appears to compel sentencing by jury in all cases regardless of the individual circumstances. Without commenting on the wisdom of this insistence on jury sentencing, we point out that the statute, Sec. c(1), unmistakably calls for an exercise of discretion by the trial court based on its consideration of the circumstances of the case.

urged by this defendant: that the constitutional provisions relating to jury trial are "for the protection of the accused," and that his "unconditional right . . . to a trial by jury" gives rise to "a correlative right to have his case decided by a judge alone if he considers such a trial to be to his advantage." *Id.* at 25–26, 85 *S.Ct.* at 785, 13 *L.Ed.*2d at 632–33. Specifically, petitioner challenged Rule 23(a) of the Federal Rules of Civil Procedure, which, like our *Rule* 1:8–1(a), called for the consent of the government and the approval of the court before defendant's waiver of jury trial could be recognized. *Id.* at 24, 85 *S.Ct.* at 783, 13 *L.Ed.*2d at 632. The Supreme Court concluded that "the Constitution neither confers nor recognizes a right of criminal defendants to have their cases tried before a judge alone," *id.* at 26, 85 *S.Ct.* at 785, 13 *L.Ed.*2d at 633, and hence the Federal Rule calling for the government's consent and the court's approval "sets forth a reasonable procedure governing attempted waivers of jury trials." *Id.*

In the course of his opinion for the Court in *Singer*, Chief Justice Warren reviewed the English common law of trial by jury, the colonial experience, and the Constitution and its judicial interpretations. *Id.* at 27–34, 85 *S.Ct.* at 786–90, 13 *L.Ed.* 2d at 633–37. From all of these he drew the conclusion that "[t]he ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right." *Id.* at 34–35, 85 *S.Ct.* at 790, 13 *L.Ed.*2d at 638. The Court concluded:

> In light of the Constitution's emphasis on jury trial, we find it difficult to understand how the petitioner can submit the bald proposition that to compel a defendant in a criminal case to undergo a jury trial against his will is contrary to his right to a fair trial or to due process. A defendant's only constitutional right concerning the method of trial is to an impartial trial by jury. We find no constitutional impediment to conditioning a waiver of this right on the consent of the prosecuting attorney and the trial judge when, if either refuses to consent, the result is simply that the defendant is subject to an impartial trial by jury—the very thing that the Constitution guarantees him.
>
> [*Id.* at 36, 85 *S.Ct.* at 790, 13 *L.Ed.*2d at 638.]

This Court has adopted the same position in *State v. Belton, supra,* 60 *N.J.* 103: "The restriction against a unilateral waiver

of jury trial by the accused presents no constitutional infirmity." *Id.* at 110 (citing *Singer v. United States, supra,* 380 *U.S.* 24, 85 *S.Ct.* 783, 13 *L.Ed.*2d 633).

The United States Supreme Court has recently held that in capital sentencing whether a judge or jury shall make the ultimate decision may be determined by state statute. In *Spaziano v. Florida,* 468 *U.S.* 447, 104 *S.Ct.* 3154, 82 *L.Ed.*2d 340 (1984), the Supreme Court reviewed Florida's capital sentencing statute, which permits the trial court to override a jury's recommendation for life imprisonment. The Court addressed the issue of whether the "capital sentencing decision is one that, in all cases, should be made by a jury," *id.* at 458, 104 *S.Ct.* at 3161, 82 *L.Ed.*2d at 351, and the Court recognized the fact that "despite its unique aspects, a capital sentencing proceeding involves the same fundamental issue involved in any other sentencing proceeding—a determination of the appropriate punishment to be imposed on an individual." *Id.* at 459, 104 *S.Ct.* at 3161, 82 *L.Ed.*2d at 352.

 As the Court indicated, the primary question should not be who makes the sentencing decision, but how that decision is made: "[t]he sentencer, *whether judge or jury,* has a constitutional obligation to evaluate the unique circumstances of the individual defendant...." *Id.* at 459, 104 *S.Ct.* at 3161, 82 *L.Ed.*2d at 351 (emphasis added). The Act meets that obligation. *See* Sec. c(5)(h). We can find no constitutional infirmity in its decision not to give a defendant an automatic right to insist on a non-jury determination of the sentencing issues.

## B. Aggravating Factor c(4)(c) as Applied to Defendant

While defendant does not claim any error in the court's charge on aggravating factor c(4)(c) ("[t]he murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim"), we treat the issue on our own motion because of its potential importance in other cases.

 The trial court first quoted the factor. Based on our construction, the trial court should not quote the statute since the initial part of it serves no function under our definition. *See State v. Ramseur, supra,* 106 *N.J.* at 211. It will serve only to confuse the jury to tell it that it must find that the murder was "outrageously or wantonly vile, horrible or inhuman," and then later instruct the jury to disregard that portion of the factor. There is no purpose in explaining to the jury why this first portion of the statute is irrelevant for its purposes. Mentioning it can only cause confusion.

After quoting the statute, the court continued by noting that although in a certain sense every murder may be viewed as vile, horrible or inhuman, that doesn't mean that there is an automatic aggravating factor in every case of murder. The Legislature had something more in mind by making that an aggravating factor. What is necessary to exist is that the attack by the defendant on Anna Olesiewicz, the victim, involved either torture or conduct indicating a depraved mind or that the attack was so savagely outrageously cruel or violent, that the adjectives wantonly, vile or horrible or inhuman are justified.

That was the entirety of the court's instructions on this aggravating factor in its main charge. The jury, quite predictably, after deliberating a very short time, returned to the courtroom with the request that the court "re-explain Part Two of the aggravating factors, clearer interpretation, because commas are confusing." The jury was obviously referring to aggravating factor c(4)(c). What follows is the colloquy between the court and the jury:

THE COURT: The question you sent out is this: Re-explain part two of the aggravating factors, clearer interpretation, because commas are confusing.

I gather that you're looking at number two on that verdict sheet?

The commas were put in there by the Legislature.

I just want you to know that.

That's the way the Legislature defined it and gave it to you in the legislative language.

In what sense are the commas, it's all in the disjunctive.

The word "or" is in there, that murder was outrageously wanton or vile or horrible or inhuman, in that it involved torture, or depravity of mind or an aggravated battery to the victim.

That's I think what you can interpolate under English Grammar for the commas, is that what was the heart of the problem may be you can give me—

THE FORELADY: The question also was, does the torture, the depravity of mind and aggravated battery, do any one of those three things have to apply? That's the point.

THE COURT: Any one of the three?

THE FORELADY: Yes.

THE COURT: If it involved either torture or depravity of mind or aggravated battery is that—I think that's a correct English reading of what the legislature wrote.

It's in the disjunctive.

As I say, any one of those.

THE FORELADY: O.K.

THE COURT: If it's still confusing, try to extract what is the heart of the confusion, and to put it to me in a definite question.

THE FORELADY: O.K.

It is obvious that this jury knew only that which a reasonably intelligent person would gather from reading this part of the statute, and that, decidedly, is not enough to guide anyone's discretion in this decision. *See Godfrey v. Georgia,* 446 *U.S.* 420, 429, 100 *S.Ct.* 1759, 1765, 64 *L.Ed.*2d 398, 406–07 (1980). The total impact of the trial court's charge in this regard was to leave the jury with this portion of the statute unexplained. As we stated in *State v. Ramseur, supra,* 106 *N.J.* at 198–199, Section c(4)(c) standing alone completely fails to channel the jury's discretion and is impermissibly vague.

What was needed was a relatively simple charge that directed the jury to consider only Section c(4)(c) of the statute as we construe that section in *State v. Ramseur, supra,* 106 *N.J.* at 198–211. Under our interpretation of Section c(4)(c) there was insufficient evidence for the jury to consider that the murder of Anna Olesiewicz was accompanied by either an aggravated battery or torture. Assuming the State claimed the defendant's acts fell within this Court's definition of "depravity of mind," the trial court could have instructed the jury as follows:

The State claims that the killing of Ms. Olesiewicz involved depravity of mind. If you unanimously find beyond a reasonable doubt that it did, then your answer shall be yes to that question on the jury sheet "That this murder involved depravity of mind." In order to find that the killing involved depravity of mind, you must find that defendant killed his victim without any purpose or

meaning because he had no reason for killing Ms. Olesiewicz other than wanting to kill.

These instructions should also direct the jury to consider all the circumstances of the murder in determining the defendant's intent, because a defendant may not state his or her motive for killing.

The charge here failed to conform this section of the statute with constitutional requirements, and this failure would be reversible error had it been raised either at trial or on appeal. Since the sentencing proceedings are to be retried in any event, we need not decide whether, despite such failure, the matter would be reversed on our own motion because of this error.

What we do decide, however, is that, contrary to our dissenting colleague's assertion, on retrial of the sentencing proceedings the State should not be foreclosed by considerations of double jeopardy from arguing the existence of aggravating factor c(4)(c). The jury should be permitted to consider that aggravating factor to the extent that it includes as one of its elements "depravity of mind" as we have defined it today. And only to that extent: we agree that the State will not be permitted to argue that the evidence warrants a finding that either an "aggravated battery" or "torture" of the victim satisfied the requirement of c(4)(c), for we have already determined that under a correct view of these factors the evidence was insufficient to go to the jury. To allow the State another opportunity to produce evidence of an "aggravated battery" or "torture" that it failed to muster at the original proceedings would run counter to fundamental double jeopardy principles. *See State v. Tropea,* 78 *N.J.* 309, 316 (1978) (citing *Burks v. United States,* 437 *U.S.* 1, 98 *S.Ct.* 2141, 57 *L.Ed.*2d 1 (1978), and *Greene v. Massey,* 437 *U.S.* 19, 98 *S.Ct.* 2151, 57 *L.Ed.*2d 15 (1978)).

That is not to say, however, that on retrial the jury should not be entitled to consider whether there is sufficient evidence of "depravity of mind" to justify imposition of the death sentence based on that element of c(4)(c). Although the State's

argument may have focused on Biegenwald's commission of an "aggravated battery," the trial court charged—and at the jury's request recharged—that in order to satisfy c(4)(c), only one of these conditions, namely, torture, depravity of mind, or an aggravated battery, had to exist. The jury concluded that aggravating factor c(4)(c), as well as c(4)(a), had been established beyond a reasonable doubt; but the verdict does not reveal which feature or combination of features of c(4)(c) the jury accepted. It may well have concluded that "depravity of mind" had been demonstrated, but if so, it reached that conclusion on the basis of an improper charge. As we have demonstrated, the trial court's instructions on c(4)(c) did not meet our formulation of that aggravating factor.

The evidence of "depravity of mind" at defendant's trial was such as to permit a jury finding, under a correct instruction, that the State had demonstrated that discrete element of the aggravating factor. We suspect that the evidence of "depravity" at the new sentencing hearing will be the same, but of course it need not be. The point is that the jury should be permitted to assess, under a correct instruction, whether "depravity" has been shown. The United States Supreme Court has recently held that

> the Double Jeopardy Clause does not require the reviewing court, if it sustains [the] claim [that the evidence was as a matter of law insufficient to support the aggravating circumstances on which defendant's death sentence was based], to ignore evidence in the record supporting another aggravating circumstance which the sentencer has erroneously rejected.
>
> [*Poland v. Arizona*, 476 *U.S.* ——, ——, 106 *S.Ct.* 1749, 1756, 90 *L.Ed.*2d 123, 133 (1986).]

This case does not involve rejection of an aggravating factor by a jury followed by a retrial of that factor; here, retrial will be on a factor that the jury found to exist. The defendant cannot complain that the fact-finder will be given the opportunity to make its determination under correct instructions. We conclude that double jeopardy considerations will not bar defendant's exposure to a death sentence at the retrial of the sentencing phase of the case.

## C. Weighing Aggravating and Mitigating Factors

While defendant did not raise the issue either at trial or on appeal, we find that the trial court's instructions in the sentencing proceeding constituted plain error of a nature to warrant our consideration *sua sponte*. *See State v. Grunow*, 102 *N.J.* 133, 148–49 (1986) (even in absence of objection, court must instruct jury on fundamental principles that control case); *State v. Federico*, 103 *N.J.* 169, 176 (1986) (obligation extends to proper charge on State's burden of proof). The error concerns the jury's function in balancing aggravating factors against mitigating factors, a function that leads directly to its ultimate life or death decision. Its effect was to allow a death sentence without a finding that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt. We hold that such a finding was required by the Act at the time of defendant's trial as a matter of fundamental fairness and that its absence mandates reversal and retrial of the penalty decision. Legislative policy also mandates this result, as indicated by the 1985 amendments to the Act; those amendments, furthermore, provide an independent basis for this result.

At the penalty phase, the prosecutor sought to establish two aggravating factors: that "[t]he defendant has previously been convicted of murder," Sec. c(4)(a), and that "[t]he murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim," Sec. c(4)(c). In support of those factors, the prosecutor submitted a certified copy of the 1959 murder conviction of defendant [7] and asked the jury, based on the testimo-

---

[7] Defendant's assertion that "prior convictions, especially those being appealed are not allowable into evidence" is meritless. Evidence of a defendant's prior murder convictions is admissible at sentencing to establish the existence of Section c(4)(a), the aggravating factor based on such prior murder convictions. The United States Supreme Court has upheld the constitutionality of statutes which, like Section c(4)(a), allow the use of prior convictions to guide sentencing decisions in death penalty cases. *See, e.g., Zant v. Stephens*, 462 *U.S.* 862, 886, 103 *S.Ct.* 2733, 2747, 77 *L.Ed.*2d 235, 255–56 (1983); *Gregg v. Georgia*,

ny at the guilt phase, to consider the murder outrageously or wantonly vile, horrible, or inhuman in that it involved an aggravated battery to the victim.

Defendant sought to establish three mitigating factors: (1) that defendant was under the influence of extreme mental or emotional disturbance, Sec. c(5)(a); (2) that defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as the result of mental disease or defect or intoxication, Sec. c(5)(d); and (3) that other mitigating factors existed relative to the defendant's character or record, or to the circumstances of the offense, Sec. c(5)(h). To substantiate those factors, the defense presented a forensic psychiatrist who testified that although Beigenwald was not legally insane, he suffered from a severe personality disorder known as anti-social personality with paranoid traits.

In its instructions, the court charged with respect to balancing aggravating and mitigating factors:

> If you find at least one aggravating factor exists, and it has been proven beyond a reasonable doubt, and also you're satisfied that a mitigating factor exists, so you will check yes, on at least one aggravating factor, yes, on at least one mitigating factor, and then you must weigh the value that is represented by the mitigating factor or factors, one, two, three, whatever it is, against the value represented by each aggravating factor that you checked, and check on the verdict sheet *whether in your judgment each aggravating factor is or is*

---

428 *U.S.* 153, 165 n. 9, 193–95, 96 *S.Ct.* 2909, 2921 n. 9, 2934–36, 49 *L.Ed.*2d 859, 870 n. 9, 886 (1976); *Proffitt v. Florida,* 428 *U.S.* 242, 248 n. 6, 251, 96 *S.Ct.* 2960, 2965 n. 6, 2966, 49 *L.Ed.*2d 913, 921 n. 6, 922 (1976). At the time of defendant's trial prior murder convictions still being appealed were inadmissible under Section c(4)(a), *State v. Biegenwald, supra,* 96 *N.J.* 630, 477 *A.*2d 318; *State v. Bey, supra,* 96 *N.J.* at 628–29. These decisions have been effectively overruled by *L.*1985, *c.*178, amending the Act to allow for the consideration of murder convictions under Section c(4)(a) regardless of whether an appeal is pending. The prosecutor in this case, however, introduced only defendant's 1959 murder conviction—a conviction as to which appellate review had long ago run its course. (Indeed at the time of sentencing in this case defendant had not yet been convicted on any of the other murder charges, *see supra* note 2, filed against him in 1983 and 1984.)

*not outweighed by the combination of whatever mitigating factors you have found to exist.*

Unless each aggravating factor which you find is outweighed by the mitigating factor, or aggravating factors,[8] or a combination of them, whichever you find, unless it is outweighed by the mitigating factors and you bring that back on your verdict sheet, the sentence will be death.

If each aggravating factor is outweighed by the mitigating factor or factors, or combination of them, the sentence then will be life imprisonment, with ineligibility for parole up to thirty years, so there is a weighing process and it occurs only if you found that both an aggravating factor, at least one, and at least one mitigating factor do exist, then *you have to weigh the values that are represented by those factors, and come to your judgment as to whether the mitigating factor outweighs or does. not outweigh the aggravating factor, which you found.* (Emphasis added.)

The special verdict form submitted to the jury asked it to find the existence of aggravating and mitigating factors and to determine if each aggravating factor was outweighed by the mitigating factors. The form completed by the jury is reproduced below:

### VERDICT FORM
### AGGRAVATING FACTORS

DO YOU UNANIMOUSLY FIND BEYOND A REASONABLE DOUBT THAT ANY OF THE FOLLOWING AGGRAVATING FACTORS EXIST? (CHECK APPROPRIATE ANSWER.)

1. That the defendant, Richard Beigenwald has previously been convicted of murder. Yes ____ No ____

2. That this murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim. Yes ____ No ____

IF ALL OF THE ABOVE ARE CHECKED 'NO', PROCEED NO FURTHER BUT RETURN THIS VERDICT SHEET TO THE COURT AS YOUR VERDICT IN THE CASE SIGNED BY YOUR FORELADY.

_____
Forelady

### MITIGATING FACTORS

DO YOU UNANIMOUSLY FIND THAT THE FOLLOWING EXIST AS MITIGATING FACTORS? (CHECK APPROPRIATE ANSWER.)

[8]The court presumably intended to refer here to "mitigating factors" (rather than "aggravating factors"). The balance of the charge clarifies the slip.

1. The defendant, Richard Beigenwald, was un-
der the influence of extreme mental or emo-
tional disturbance insufficient to constitute a
defense to prosecution. Yes ____ No ____

2. The defendant's capacity to appreciate the
wrongfulness of his conduct or to conform his
conduct to the requirements of the law was
significantly impaired as the result of mental
disease or defect but not to a degree suffi-
cient to constitute a defense to prosecution. Yes ____ No ____

3. Any other factor which is relevant to the
defendant's character or record or to the cir-
cumstances of the offense. Yes ____ No ____

IF YOU HAVE CHECKED AT LEAST ONE AGGRAVATING FAC-
TOR 'YES' AND HAVE CHECKED ALL OF THE ABOVE MITIGAT-
ING FACTORS 'NO' PROCEED NO FURTHER BUT RETURN THIS
VERDICT SHEET TO THE COURT AS YOUR VERDICT IN THE
CASE, SIGNED BY THE FORELADY. THE PENALTY WILL THEN
BE DEATH.

_____
 Forelady

IF YOU HAVE CHECKED ONE OR MORE AGGRAVATING FAC-
TORS 'YES' AND ONE OR MORE MITIGATING FACTORS 'YES',
THEN STATE AS TO EACH AGGRAVATING FACTOR CHECKED
'YES' WHETHER IT IS OR IS NOT OUTWEIGHED BY ANY ONE
OR COMBINATION OF ANY OF THE MITIGATING FACTORS
CHECKED 'YES'. THIS DECISION ALSO MUST BE UNANIMOUS.
IF AN AGGRAVATING FACTOR IS FOUND AND NOT OUT-
WEIGHED BY MITIGATING FACTORS, THE PENALTY WILL BE
DEATH.

AGGRAVATING FACTOR #1, IS, IS NOT (SELECT ONE AND CIR-
CLE IT) OUTWEIGHED BY THE MITIGATING FACTOR(S).

AGGRAVATING FACTOR #2, IS, IS NOT (SELECT ONE AND CIR-
CLE IT) OUTWEIGHED BY THE MITIGATING FACTOR(S).

_____
 Forelady

_____

Although the court did not mention the possibility of the mitigating and aggravating factors being in equipoise, the clear conclusion from its statement that aggravating factors must be outweighed in order for a sentence of life imprisonment to be imposed was that if aggravating and mitigating factors were of equal weight, the penalty would be death. In addition, neither the court nor the verdict form instructed the jury that for the death penalty to be imposed, the State must prove the requisite balance *beyond a reasonable doubt.*

After returning twice to seek further guidance from the court, the jury found beyond a reasonable doubt that both aggravating factors existed. With respect to the mitigating factors, the jury did not find that the defendant was under the influence of extreme mental or emotional disturbance, Sec. c(5)(a), but did find that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as a result of mental disease or defect, Sec. c(5)(d). The jury also found as a mitigating factor that another unspecified factor existed relevant to the defendant's character or record or to the circumstances of the offense. Sec. c(5)(h). The jury concluded that neither aggravating factor was outweighed by the combined mitigating factors.[9]

---

[9]The trial court instructed the jury that it was to weigh *each* of the aggravating factors against *all* of the mitigating factors. Other trial judges have read the statute as requiring that *all* aggravating factors were to be weighed against *all* mitigating factors. For example, the trial court so instructed the jury in *State v. Ramseur, supra,* 106 *N.J.* at 317. The 1985 amendment to the Act sought to "[c]larify that the aggravating factors must outweigh any mitigating factors in order for a death sentence to be imposed." Stat. of Purpose to S.950 at 2 (Nov. 29, 1984). The statute, as amended in 1985, clearly requires that all aggravating factors are to be balanced against all mitigating factors. Sec. c(3)(a) and (b). A bill introduced in 1986, passed by the Senate and pending in the Assembly, provides even more specifically that the jury must weigh "the sum total of all of the aggravating factors" against "the sum total of all of the mitigating factors" before a verdict of death shall be imposed. S.1680 at 3 (Feb. 10, 1986). Although the trial court incorrectly charged the jury that it was to weigh *each* aggravating factor against *all* mitigating factors, we note

The relevant language, as it existed at the time of the trial, is found in Section c(3):

The jury, or if there is no jury, the court shall return a special verdict setting forth in writing the existence or nonexistence of each of the aggravating and mitigating factors set forth in paragraphs (4) and (5) of this subsection. If any aggravating factor is found to exist, the verdict shall also state whether it is or is not outweighed by any one or more mitigating factors.

(a) If the jury or the court finds that any aggravating factor exists and is not outweighed by one or more mitigating factors, the court shall sentence the defendant to death.

(b) If the jury or the court finds that no aggravating factors exist, or that any aggravating factors which exist are outweighed by one or more mitigating factors, the court shall sentence the defendant pursuant to subsection b.

Another provision of the Act, Section c(2), provides that the State has "the burden of establishing beyond a reasonable doubt the existence of any aggravating factors," and that the defendant has "the burden of producing evidence of the existence of any mitigating factors...."

The Act, in its original form, said nothing about the burden of proof in the weighing process. The trial court's charge conforms to the Act's original wording. Nevertheless, the literal reading has been the subject of criticism. For example, the initial report of the Trial Judges' Committee on Capital Causes, *see State v. Ramseur, supra,* 106 *N.J.* at 155 n. 2, called for a charge that imposed on the State a burden of proving the result of the balancing process *beyond a reasonable doubt,* although the Act was silent in that regard.[10] That conclusion

---

that particular error obviously did not prejudice the defendant. On the contrary, it favored him.

[10]That Judges' Committee was sharply divided over whether the jury must also find that the aggravating factors outweighed the mitigating factors, even though the statute clearly set forth a different standard, namely, that the jury must find that the aggravating factors are not outweighed by the mitigating factors. The majority agreed with the trial court in this part of the formulation, but disagreed with its omission of the "beyond a reasonable doubt" burden. As noted above, we have concluded not only that the "beyond a reasonable doubt" burden applies, but that properly construed, the Act calls for a finding that the aggravating factors outweigh the mitigating factors.

was presumably based on New Jersey's traditional concern for the rights of defendants charged with capital offenses.

New Jersey has always required proof beyond a reasonable doubt in criminal prosecutions. *See, e.g., State v. Bess, supra,* 53 *N.J.* at 18; *State v. Emery,* 27 *N.J.* 348, 353 (1958) (quasi-criminal drunk driving proceeding requires proof beyond a reasonable doubt). That requirement antedates any suggestion that the Constitution compels that burden. *In re Winship, supra,* 397 *U.S.* 358, 90 *S.Ct.* 1068, 25 *L.Ed.*2d 368; *see Mullaney v. Wilbur,* 421 *U.S.* 684, 95 *S.Ct.* 1881, 44 *L.Ed.*2d 508 (1975). We thus approach this statutory language with a long-standing practice in the criminal law of this state, a practice quite different from the terms of the statute.

Our construction of the statute is based to some extent on the functional similarity of aggravating factors and the weighing process itself to the traditional proof of "elements of an offense." The burden is firmly fixed in this state where an element of an offense is involved: The State has the burden to prove that element "beyond a reasonable doubt." *N.J.S.A.* 2C:1–13a. We note that in some other states "aggravating factors" are elements of the capital crime, and during the guilt phase of trial the State must prove beyond a reasonable doubt the existence of one or more aggravating factors before the defendant becomes "death-eligible." *See, e.g., State v. Silhan,* 302 *N.C.* 223, 275 *S.E.*2d 450, 482 (1981). Technically, of course, the death penalty is imposed as part of the sentencing proceeding, and under ordinary analysis, the State need not prove its contentions at the sentencing proceeding beyond a reasonable doubt, even those that are statutorily prescribed. *See McMillan v. Pennsylvania,* 477 *U.S.* ——, ——, 106 *S.Ct.* 2411, 2415–19, 91 *L.Ed.*2d 67, 74–79 (1986) (where legislature provided mandatory sentence for visible possession of firearm, State need only prove possession by preponderance of evidence and there is not denial of due process when possession is statutorily defined as a sentencing consideration). Here, how-

ever, the sentencing proceeding calls for a different treatment because death is "profoundly different," *Lockett v. Ohio,* 438 *U.S.* 586, 605, 98 *S.Ct.* 2954, 2965, 57 *L.Ed.*2d 973, 990 (1978) (plurality opinion), both in terms of its consequences and because it is a procedurally unique sentencing scheme, *see Bullington v. Missouri,* 451 *U.S.* 430, 438, 101 *S.Ct.* 1852, 1857, 68 *L.Ed.*2d 270, 278 (1981). The statutory requirement that the State must prove aggravating factors beyond a reasonable doubt—even though that proof is likewise part of a sentencing proceeding—is some indication of the Legislature's appreciation of that difference, and of its probable intention to impose the same burden on the weighing process itself. The Legislature, in recognizing this functional equivalence by requiring proof beyond a reasonable doubt of any aggravating factor, demonstrated the appropriateness of attaching the protective requirements ordinarily confined to the determination of guilt to the sentencing proceeding as well. There may be analogous determinations made by a judge, of great import, that are governed by a standard that is not "beyond a reasonable doubt," *see, e.g., N.J.S.A.* 2C:43–6b; but in New Jersey, where the jury is charged with making that value judgment, a determination of death despite reasonable doubt as to its justness would be unthinkable. We can think of no judgment of any jury in this state in any case that has as strong a claim to the requirement of certainty as does this one.

It is one thing to impose this burden of proof, beyond a reasonable doubt, where the statute is silent on the question; it is another to require the State to prove that the aggravating factors outweigh the mitigating factors when the Act provides, quite clearly, that the State must prove that the aggravating factors are not outweighed by the mitigating factors. The two formulations differ in result only when the jury finds that the aggravating factors and mitigating factors are in equipoise. If the State must prove the aggravating factors outweigh the mitigating factors, then equipoise will not result in a death sentence; if the State must prove that the aggravating factors

are not outweighed by the mitigating factors, then equipoise *does* result in a death sentence. That single point on this shifting balance between aggravating and mitigating factors may make the difference between life and death. More than that, we believe that the phrasing of the question is more disadvantageous to the defendant than is suggested by the logical analysis wherein the only difference results where the factors are "in equipoise." It is not a very substantial change in a juror's mind that is required to transform "you must find, beyond a reasonable doubt, that the aggravating factors are not outweighed by the mitigating factors" to "you must find, beyond a reasonable doubt, that the mitigating factors outweigh the aggravating factors."

This potential for confusion [11] brings us to the strongest reason for interpreting the Act to require the State to prove,

---

[11]The initial report of the Judges' Committee on Capital Causes, *supra*, illustrates awareness of this potential confusion, and "restat[ed] the test," in its original report, Judges Bench Manual for Capital Cases at 69 (September 1982), as follows: "[T]he death penalty is imposed if the jury is convinced beyond a reasonable doubt that the *aggravating factors either outweigh the mitigating factors or that the weight of the aggravating factors and the mitigating factors are equal.*" (Emphasis added.) The same formulation is given in the proposed charge to the jury suggested by that Committee. *Id.* at 70–71. The potential for confusion, however, is nowhere better illustrated than in the proposed special verdict form in the Manual where the question for the jury is: "Are you convinced beyond a reasonable doubt that the mitigating factor[s] outweigh the aggravating factor[s]. Please check one. Yes ___ No ___." The Bench Manual, referring to the verdict sheet in its proposed charge, provides: "Notice that on your verdict sheet you are asked, 'Do the mitigating factors or factor outweigh the aggravating factors or factor?' You must check 'Yes' or 'No.' Check 'No' only if you are convinced beyond a reasonable doubt that the aggravating factor[s] outweigh[s] the mitigating factor[s] or that the aggravating and mitigating factors are of equal weight." *Id.* at 71. This statement from the proposed charge purporting to explain the question on the verdict sheet directly contradicts it. It would be unclear whether a defendant was sentenced to death because the jury, although believing that the mitigating factors outweighed the aggravating, was not convinced of this beyond a reasonable doubt—whereas the law provided that all that was required to avoid death was that the jury find the mitigating factors outweigh the aggravating even though

beyond a reasonable doubt, that the aggravating factors outweigh the mitigating. In no proceeding is it more imperative to be assured that the outcome is fair than in these cases. It is difficult to believe that the Legislature thought it fundamentally fair that a defendant be executed *except* where the mitigating factors *outweigh* the aggravating; the concept of executing him where the explanations for his misconduct (the mitigating factors) were equally as significant as the culpable aspects of that misconduct (the aggravating factors) is foreign to what the Legislature would certainly intend. We speak here about the ultimate value judgment, the ultimate question of life or death, for while the formulation is in terms of "beyond a reasonable doubt," and therefore appropriately applicable to fact-finding, the weighing process really is not fact-finding at all but a judgmental determination by the jury, based on conflicting values, of whether defendant should live or die. *See Barclay v. Florida*, 463 *U.S.* 939, 950, 103 *S.Ct.* 3418, 3425, 77 *L.Ed.*2d 1134, 1144 (1983) (plurality opinion) ("It is entirely fitting for the moral, factual, and legal judgment of judges and juries to play a meaningful role in sentencing."). If anywhere in the criminal law a defendant is entitled to the benefit of the doubt, it is here. We therefore hold that as a matter of fundamental fairness the jury must find that aggravating factors *outweigh* mitigating factors, and this balance must be found beyond a reasonable doubt.

There is persuasive legislative history for the position that the Legislature, despite the statutory language, intended to

---

the jury would have the greatest doubt about the conclusion. All subsequent proposed special verdict sheets eliminated that particular confusion.

The Committee on Capital Causes made it clear in its first revision to the Judge's Bench Manual for Capital Cases (Jan. 17, 1983) that its conclusion requiring a "beyond a reasonable doubt" charge was a majority view and that judges who disagreed should follow their "own independent judgment"; it also indicated that a vocal minority disagreed with the interpretation that allowed death to be imposed where aggravating and mitigating factors were in equipoise. *Id.* at 72.

require that aggravating factors outweigh mitigating factors before the death penalty could be imposed. At a public hearing before the Senate Judiciary Committee, Edwin Stier, then Director of the Division of Criminal Justice in the Department of Law and Public Safety, testified concerning Senate Bill 112 (May 20, 1982) (the bill that led to the enactment of the Act). It is clear from the questioning that the Committee was looking to Mr. Stier both for analysis and guidance and that his views were highly regarded. Numerous suggestions he made were adopted by the Committee. At a point when the question of the burden of proof of aggravating and mitigating factors was being discussed, Mr. Stier, having suggested that the Bill's original requirement that mitigating factors be established "by a preponderance of the evidence" be eliminated, was asked, "Basically, you have eliminated that. Have you replaced it with anything? If not, what is the test? The trial judge is sitting there and he is asking himself." Mr. Stier's response was:

What we have tried to do is to establish the State's burden beyond a reasonable doubt, to establish sufficient *aggravating factors to outweigh the mitigating factors which exist.* The defendant has no burden of proof on those mitigating factors. That is what we intended to do with this. (Emphasis added.)

Shortly thereafter the following question was posed: "Now, the ultimate test is, do the aggravating factors outweigh the mitigating. I raise the point I am raising now just to make sure we don't have some trial judge that may be as confused as we lawyers here saying, 'What do they intend?' I raise that, Ed [Stier], because I want to know if you see any need to spell it out anymore?" Mr. Stier responded:

At this point, I can't say that I do. I think what we have here is a situation in which the proceeding according to the way the bill is drafted would proceed as follows: the jury would have to find any aggravating factors beyond a reasonable doubt. Factually they would have to find those factors beyond a reasonable doubt. And, then they would weigh those aggravating factors against the mitigating factors. And, if they *found that the aggravating factors outweigh the mitigating factors,* they would impose the death penalty. Procedurally, that is how it would occur. (Emphasis added.)

The interpretation of the original version of the Act to require that the aggravating factors outweigh the mitigating

beyond a reasonable doubt is also strongly supported by the recently passed amendment, *L.*1985, *c.*178. The initial statement accompanying Senate Bill 950, introduced by Senator Russo in the 1984 session of the Legislature, says: "This bill is intended to *clarify* several procedural aspects of the capital punishment statute. Those *clarifications* are as follows: ... 5. *clarify* that aggravating factors must outweigh any mitigating factors in order for a death sentence to be imposed." S.Stat. to S.950 at 1 (March 1, 1984) (emphasis added). The Bill also required that the balance be proven beyond a reasonable doubt. This statement of intent by the Legislature that it is "clarifying" a previous law is obviously not dispositive.[12] Nevertheless, when combined with the testimony before the Senate Judiciary Committee, it constitutes persuasive support for this construction.

A provision of our Code of Criminal Justice designed to assure fairness among similarly situated defendants with respect to changes introduced by the Code supports our conclusion that especially in capital cases the equities require like procedural treatment among death-eligible defendants. While not directly applicable, this provision, *N.J.S.A.* 2C:1–1c(1), is instructive. It provides:

---

[12]The Senate Judiciary Committee, however, issued a subsequent statement on November 29, 1984, to accompany S.950. S.Stat. to S.950. The later statement says in the introductory paragraph that "Senate Bill No. 950 proposes a series of amendments to New Jersey's capital punishment statute. In enacting the amendments contained in this bill, the intent of the Legislature is to effect only prospective changes. The amendments are not intended to apply retrospectively or to affect cases now on appeal." *Id.* at 1. Furthermore the Assembly Judiciary Committee Statement dated February 4, 1985, contains language identical to that in the later Senate Statement above. Assemb.Judiciary Comm.Stat. to S.950 at 1. Both of these statements, however, indicate in the specific section on weighing aggravating and mitigating factors that the bill merely "clarifies" that there is a reasonable doubt requirement whereas the previous statute was "silent" on the issue. In sum, despite our conclusion that the balancing provision of Senate Bill 950 was intended only to clarify the earlier statute, this conclusion is admittedly less than crystal clear from the legislative history.

In any case pending on or initiated after the effective date of the code involving an offense committed prior to such date.... [t]he procedural provisions of the code shall govern, insofar as they are justly applicable and their application does not introduce confusion or delay....

While this provision was intended to accomplish justice in those cases that were pending when the Code of Criminal Justice was enacted by applying the Code's procedural provisions where appropriate, it also signifies generally a legislative intention to give the benefit of new laws where possible, and where just, to those who are charged under old laws.[13]

The legislative intent regarding retroactive operation of the amendment is somewhat clouded by the fact that both the Senate and Assembly Judiciary Committees' Statements that accompanied the release of Senate Bill 950, which included numerous other amendments to the Act, indicated that the provisions were not intended to be retrospective or "to affect cases now on appeal." *See supra* note 12. The force of that declaration is diminished, however, by the fact that the same Statements contain language clearly directing that *this* portion of its provisions ("aggravating factors [must] outweigh beyond a reasonable doubt all of the mitigating factors") is intended to *clarify* the original version of the Act.

Ultimately our determination is based on fundamental fairness, a determination we believe the Legislature would share. The Act, from the date of its introduction to this very day, has been in a state of reevaluation, revision, and analysis. Chapter 178 of the Laws of 1985 has effected what probably will turn out to be the most substantial revision, but in fact there have been even later revisions and there are bills still pending for further revision.[14] The Legislature has apparently finally de-

---

[13]In *State v. Molnar*, 81 *N.J.* 475 (1980), although finding that the equities in that case did not justify retroactive application, we held that the question of allocation of burden of proof was a "procedural provision" within the meaning of *N.J.S.A.* 2C:1–1c(1), and that cases on appeal were "pending" within the meaning of that section. *Id.* at 487–89.

[14]*See L.*1985, *c.*478; S.1680 (Feb. 10, 1986).

termined that in order for death to be imposed, the State must prove beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors. Given the relatively short period of time that has transpired between the enactment of the Act in 1982, and the amendments in 1985, we would regard it as impermissibly harsh to apply to one defendant, on this critical question of life and death, a standard significantly less favorable than that to be applied to another defendant, merely because of the relatively short time differential between the commission of their crimes. Much more is at stake than doing justice to Mr. Biegenwald. What is at stake is the fundamental fairness of a system that generates life and death decisions.

We do not suggest that every time the criminal law changes for the benefit of defendants, it should apply to all who ever committed that crime, no matter how many years before that change, any more than we would imply (contrary to the Constitution) that when the criminal law is changed to make it *harsher* towards defendants, any such retroactive application would be appropriate. The unfairness, if there be any, in not applying the laws retroactively in these cases is balanced by the needs of the practical administration of justice; the system cannot continually retry, reevaluate, or resentence all those convicted under prior laws every time that law is changed. *See State v. Burstein,* 85 *N.J.* 394, 406 (1981); *see also Johnson v. New Jersey,* 384 *U.S.* 719, 727, 86 *S.Ct.* 1772, 1777, 16 *L.Ed.*2d 882, 888 (1966) (in determining whether two decisions should be applied retroactively, the Court considered "the effect on the administration of justice"). However, with respect to the death penalty, and changes within only a three-year period that affect its imposition, it is both unjust, and probably outside of the Legislature's intent, *not* to give those previously tried the benefit of provisions intended to have been in the law in the

first place.[15] Although we do not in any way rest our holding on considerations of efficiency, we note that there is no substantial problem of judicial administration here.[16] Although our holding will require retrial of the sentencing proceeding in this case and in some others, the price is relatively small for assuring fairness in this most awesome of all determinations: shall the defendant live or shall he die?

 We therefore hold that in all cases tried under the Act, in order for the death penalty to be imposed, the State must prove beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors.

## VI.

### Resentencing

In vacating and remanding this death sentence, we foresee no double-jeopardy problems arising from resentencing defendant. It is, after all, standard practice for the United States Supreme Court to vacate and remand a death sentence for resentencing while leaving the underlying conviction intact. *See, e.g., Eddings v. Oklahoma,* 455 *U.S.* 104, 102 *S.Ct.* 869, 71 *L.Ed.*2d 1 (1982); *Adams v. Texas,* 448 *U.S.* 38, 100 *S.Ct.* 2521, 65 *L.Ed.*2d 581 (1980); *Roberts v. Louisiana,* 431 *U.S.* 633, 97 *S.Ct.* 1993, 52 *L.Ed.*2d 637 (1977); *Gardner v. Florida,* 430 *U.S.* 349, 97 *S.Ct.* 1197, 51 *L.Ed.*2d 393 (1972). Many state statutes, moreover, provide explicitly for such a resentencing in the event that a death sentence is vacated on legal grounds (as opposed to

---

[15]We note that a Senate bill introduced in 1986 by Senator Russo would, among other things, further clarify the weighing function by providing that "if any aggravating factors are found to exist, the verdict shall state whether the *sum total* of all of the aggravating factors outweigh beyond a reasonable doubt the *sum total* of all of the mitigating factors which are found to exist." S.1680 at 3 (Feb. 10, 1986) (emphasis added).

[16]We note that only 15 capital cases were tried before *L.*1985, *c.*178 was enacted.

insufficient evidence). *See, e.g.,* Ala.Code ¶ 13A–5–53(d) (1982); N.C.Gen.Stat. § 15A–2000(d)(3) (1984); Va. § 19.2–264.3(C) (1983); S.C.Code Ann. § 16–3–25(E) (1–2) (Supp.1984); La.Code Crim.Proc.Ann. tit. 30, ch. 3, art. 905.1(B) (1984); *cf.* Ga.Code Ann. § 17–10–35(e)(1–2) (authorizing the State Supreme Court to "[s]et the sentence aside and remand the case for resentencing by the trial judge based on the record and argument of counsel ...."). *But see* Ohio Stat.Ann. § 2929.06 (1982) (providing for imposition of life sentence should resentencing be required); *Commonwealth v. Floyd,* 506 *Pa.* 85, 484 *A.*2d 365 (1984) (resentencing shall result in imposition of life imprisonment); *Eddings v. State,* 688 *P.*2d 342 (Okla.Crim.App.1984) (construing provision identical to Georgia's, holding that resentencing shall result in modification of sentence to life imprisonment), *cert.* den., 470 *U.S.* 1051, 105 *S.Ct.* 1750, 84 *L.Ed.*2d 814 (1985).

The present case is distinguishable, moreover, from *Bullington v. Missouri, supra,* 451 *U.S.* 430, 101 *S.Ct.* 1852, 68 *L.Ed.* 2d 270, in which the Court held that a defendant who had successfully appealed a conviction for which a life sentence had been given could not be exposed to a death sentence on retrial; retrial of the instant case on the issue of penalty would result in no escalation in the severity of the potential punishment. *See Knapp v. Cardwell,* 667 *F.*2d 1253, 1265 (9th Cir.1982) (distinguishing *Bullington* in part because "[t]he sentence that can be imposed on resentencing here cannot be more severe than that previously assessed"), *cert.* den., 459 *U.S.* 1055, 103 *S.Ct.* 473, 74 *L.Ed.*2d 621 (1982); *State v. Watson,* 120 *Ariz.* 441, 586 *P.*2d 1253 (1978) (en banc), *cert.* den., 440 *U.S.* 924, 99 *S.Ct.* 1254, 59 *L.Ed.*2d 478 (1979).

■■■ Resentencing cannot be considered double-jeopardy where the first sentence was a death sentence and the evidence was sufficient. This does not mean that the State can charge any aggravating factors at resentencing that were not found by the jury in the first sentencing phase. *Zant v. Redd,* 249 *Ga.*

211, 290 *S.E.*2d 36, 39 (1982), *cert.* den., 463 *U.S.* 1213, 103 *S.Ct.* 3552, 77 *L.Ed.*2d 1398 (1983); *see also Miller v. State,* 237 *Ga.* 557, 229 *S.E.*2d 376, 377 (1976) (pre-*Bullington* case holding that "a new trial on the sentence can be held before a new jury where the jury that convicted the accused also sentenced him to death and the sentence was reversed on appeal because of some error that infected the sentence").

Under this state's prior capital punishment statute, trials were unitary, and an error affecting the imposition of sentence resulted, until *State v. Laws,* 51 *N.J.* 494, *cert.* den., 393 *U.S.* 971, 89 *S.Ct.* 408, 21 *L.Ed.*2d 384 (1968), in a remand for a new trial on the issues of both guilt and sentence. *See, e.g., State v. Mount,* 30 *N.J.* 195 (1959); *State v. White,* 27 *N.J.* 158 (1958). In *State v. Laws, supra,* 51 *N.J.* 494, however, this Court modified defendants' sentences to life imprisonment where an error affected penalty alone. The Court held that a retrial limited to the issue of penalty would be inappropriate; its holding was based largely, however, on practical grounds:

> Obviously, the old jury could not now be reconstituted ... [n]or could a new jury pass on the matter of punishment alone without being familiar with "all the evidence...." It is conceded that the State would be unable to produce all of the witnesses at the original trial, and any suggestion that a new jury could fairly be called upon to read the many thousands of pages of testimony at the former trial in lieu of hearing live witnesses, would appear to be too unrealistic to require discussion.
>
> [*Id.* at 512.]

Thus, the Court did not reject a resentencing trial on double-jeopardy grounds. The Court acknowledged, moreover, that its resistance to resentencing was due largely to the fact that bifurcated trials were foreign to New Jersey, *id.;* "[w]hether bifurcation should be adopted for the future," the Court advised, "calls for thorough study." *Id.* That "thorough study" can be said to have resulted in the passage of the Act we uphold today. Because *Laws* was decided under a unitary trial statute, and because the *Laws* Court's major misgiving about a separate trial on the issue of penalty—the foreignness of bifur-

cation—has been removed, *Laws* is not controlling precedent for the present case.

Since the reversible error affects only the sentencing proceeding, retrial shall be limited to that portion of the trial. Guilt shall not be retried. *See State v. Jeffers*, 135 *Ariz.* 404, 661 *P.*2d 1105, *cert.* den., 464 *U.S.* 865, 104 *S.Ct.* 199, 78 *L.Ed.* 2d 174 (1983); *Blankenship v. State*, 251 *Ga.* 621, 308 *S.E.*2d 369 (1983); *State v. Teague*, 680 *S.W.*2d 785 (Tenn.1984).

Numerous questions may arise on resentencing, questions that are best answered initially at the trial level, and best determined by an appellate court on a full record. In the interest of judicial economy, however, we will provide some tentative directions, guidance and suggestions.

The Act is silent with respect to proceedings on retrial. The major question is whether to attempt to impanel the same jury that heard the case originally or to select a new jury. While the original jury has the advantage of having heard the testimony at the guilt phase of the trial (thereby avoiding the necessity of repeating some of that testimony), the disadvantages far outweigh the advantages. Even as to the supposed "advantages," the time lag between the original trial of the guilt phase and the retrial of sentencing phase may be so long as to raise a question about the initial jury's ability to remember that testimony. Intervening events would be a subject of careful examination on *voir dire* in order to assure that they have not prejudiced any of the original jurors, as well as to ascertain whether any juror's mind had become unalterably fixed on the question of the sentence. We believe that these objections— not to mention the problems that may arise simply in locating and impaneling the original jury—are almost insuperable. We therefore conclude that a new jury must be selected. *See State v. Finnell*, 101 *N.M.* 732, 688 *P.*2d 769, 772, *cert.* den., 469 *U.S.* 918, 105 *S.Ct.* 297, 83 *L.Ed.*2d 232 (1984); *Watkins v. Commonwealth*, 229 *Va.* 469, 331 *S.E.*2d 422, 431 (1985), *cert.* den., —— *U.S.* ——, 106 *S.Ct.* 1503, 89 *L.Ed.*2d 983 (1986); *Hopkin-*

*son v. State,* 664 *P.*2d 43, 84 (Wyo.), *cert.* den., 464 *U.S.* 908, 104 *S.Ct.* 262, 78 *L.Ed.*2d 246 (1983).

It seems clear that, where the witnesses are available, the State is required to present testimony through them rather than by offering a transcript of their testimony at the original trial. *See State v. Arnett,* 125 *Ariz.* 201, 608 *P.*2d 778, 780 (1980). Ordinary rules of hearsay call for such live testimony. *See Evid.R.* 63(3). While the Act's reference to the State's obligation to comply with the Rules of Evidence (*see L.*1985, *c.* 178) presumably contemplates the initial trial, there is no reason why this obligation should not also be applicable to resentencing. Therefore both the hearsay rule itself and the Act require live testimony where the witness is available. There likewise seems to be no reason why the Act should not also be used in determining the form of evidence to be presented by defendant. The Act allows proof of mitigating circumstances without regard to the Rules of Evidence. *L.*1985, *c.* 178. We therefore conclude that defendant has the option of presenting either live testimony or transcripts of testimony even where the witness is available. Under those circumstances, however, the rule allowing the State to rebut such ordinarily inadmissible testimony without regard to the Rules of Evidence (*L.*1985, *c.* 178) should also apply.

Since the retrial is limited to resentencing, the only admissible evidence is that relevant to the issue, namely, evidence of aggravating and mitigating factors. Retrial of issues relevant only to guilt is not permitted. While defendant may lose whatever advantage inheres in the "residual doubts" that the original jury may have had regarding defendant's guilt, *see Lockhart v. McCree,* 476 *U.S.* ——, ——, 106 *S.Ct.* 1758, 1769, 90 *L.Ed.*2d 137, 153 (1986), the State may also lose whatever "advantage" inheres in the emotional impact that often surrounds the initial guilt phase. A substantial amount of the evidence admitted initially in the guilt phase nevertheless may be admissible in the retrial of the sentencing proceeding, for often issues relevant to one are relevant to the other. In this

case, the State will presumably be required to prove the circumstances of the murder, as it did in the guilt phase, in order to prove aggravating factor c(4)(c).

Finally, it seems as if the State and the defense are free to present new evidence, testimony or documentation not presented at the original sentencing proceeding, and that the new jury may reach conclusions concerning aggravating factors and mitigating factors different from and inconsistent with the findings at the original sentencing proceeding. In other words, neither side is assured, at the new trial, of the "benefits" gained in the original trial. The only constitutional restriction applicable to retrials in criminal cases is that the defendant may not be subject to punishment beyond that imposed in the first trial, and since death was the verdict in the first trial that issue is immaterial here.

### Conclusion

As we stated in *State v. Ramseur, supra*, 106 *N.J.* at 331, it is not for this Court to pass on the wisdom or the ultimate morality of the death penalty. That issue is for the Legislature and the Governor, and for them alone. Our function is to determine whether their decision and the law implementing it are constitutional, and thereafter to review cases where the death penalty is applied. We find the act constitutional in all respects but reverse the imposition of the death penalty for the reasons set forth above and remand the matter for a new trial of the sentencing proceedings only, in accordance with this opinion. We affirm the murder conviction.

HANDLER, J., dissenting.

Richard Biegenwald was convicted of murder and sentenced to death. He challenges the constitutionality of the capital murder-death penalty statute, *L.* 1983, *c.* 111, under which he was prosecuted. He claims that other errors occurred in the course of his prosecution and trial that require a reversal of his conviction and sentence. The majority sustains the murder

conviction but reverses defendant's death sentence. I would reverse defendant's conviction as well as his sentence, and therefore dissent.

The Court, essentially for the reasons expressed in the companion case of *State v. Ramseur,* 106 *N.J.* 123 (1987), also decided today, upholds the constitutionality of the capital murder-death penalty statute. It also concludes that there was no reversible error occasioned by adverse pretrial publicity that was aggravated by the conduct of the prosecutor, or by the denial of a change of venue, or by the manner in which the *voir dire* examination of petit jurors was conducted. It further determines that there was no reversible error with respect to the trial court's charge on "reasonable doubt" or the denial of defendant's request to waive a jury in the sentencing phase of the trial. With respect to the trial on sentence, however, the Court finds that the trial court failed to give a correct instruction concerning the meaning and application of an aggravating factor critical to the determination of capital murder and did not properly instruct the jury as to the establishment and weighing of aggravating and mitigating factors, which errors created sufficient prejudice to require reversal of the death sentence and a remand for a resentencing trial at which defendant will face again the prospect of the death penalty.

I differ from the Court as to the constitutionality of the capital murder-death penalty statute. I expressed the opinion in *Ramseur* that the Court must examine the constitutional issues in terms of both the federal and State Constitutions. Particularly, the Court must analyze and apply state constitutional principles because federal constitutional doctrine relating to capital punishment is seriously flawed and because state sovereign concerns relating to the death penalty markedly outweigh any national interest in capital punishment or other concerns of federalism. I reasoned that state constitutional principles place the highest value on individual life and require the greatest protections when life itself is at stake; these principles, enhanced by considerations of fundamental fairness,

impel the conclusion that the capital murder-death penalty statute is violative of state constitutional standards prohibiting cruel and unusual punishment and mandating due process. Because these major constitutional issues were fully considered by the majority and dissenting opinions in the *Ramseur* case, and are not further treated by the Court in this case, I have not here again addressed the constitutionality of the capital murder-death penalty statute.

In addition to differing sharply from the Court on constitutional grounds, I cannot agree with its determination that defendant's murder conviction was not severely prejudiced by intense adverse pretrial and trial publicity, which was materially exacerbated by prosecutorial misconduct and was not cured by a change of venue or corrected by an adequate *voir dire* examination of jurors. I agree with the reasoning of the majority that reversible error occurred with respect to the trial court's instructions on sentencing. However, because of the evidentiary insufficiency and incorrect charge relating to a material element of capital murder, namely, the aggravating factor of c(4)(c), I believe that the reversal of defendant's death penalty sentence should be deemed an acquittal on the death sentence and constitute a bar to another trial seeking the death penalty.

These issues are the subject of this dissenting opinion. I address first the nature and extent of the adverse pretrial publicity, noting particularly its impact upon the selection of jurors. I then consider whether defendant was entitled to a change of venue, emphasizing the heightened standards governing the right to a fair and impartial jury in a prosecution for capital murder. This concern requires consideration of whether the *voir dire* examination was adequate to overcome the effects of prejudicial pretrial publicity and to assure defendant's right to a fair and impartial jury in light of the fact that the trial court refused to change the venue of the trial. Finally, I review the grounds for reversing defendant's death sentence and consider whether defendant, under state constitutional prin-

ciples of double jeopardy and fundamental fairness, can again be tried for the purpose of imposing the death penalty.

## I.

Defendant claims that he was denied a fair trial before an impartial jury due to massive prejudicial pretrial and trial publicity, which was materially aggravated by the prosecutor's needless and unjustifiable publicizing of the case prior to trial. Defendant contends that it was error to deny his motion to change venue in the face of such prejudicial publicity. He further contends that this prejudice was not otherwise overcome, particularly in that the trial court failed to conduct an adequate *voir dire* examination of jurors. Moreover, the court's refusal in the *voir dire* to excuse several jurors for cause or to allow the attorneys to question prospective jurors or to permit defense counsel to challenge jurors for cause at side bar compounded the inadequacies of the *voir dire.*

These errors, defendant contends, violated his right to a fair trial under the due process guarantee of the fifth and fourteenth amendments and the sixth amendment right to an impartial jury under the federal Constitution, as well as Article I, paragraphs 1 and 12 of the State Constitution. A proper understanding of these issues and their resolution entails first a detailed exposition of the facts relating to the publicity surrounding the investigation and prosecution of the crime and its impact on prospective and selected jurors when the trial commenced.

## A.

Media coverage of defendant's crime was extensive, graphic, and sensational. During a three to four month period in the spring and early summer of 1983, there was widespread publicity about the defendant in newspapers distributed throughout Monmouth County, the vicinage in which the prosecution was brought. Newspaper articles linked the defendant to as many

as seven murders in the area; they also disclosed the fact that defendant had a prior murder conviction. Front-page articles in the widely read *Asbury Park Press* during this period contained pictures of police efforts to find and recover buried bodies and maps to grave sites where bodies were found, as well as pictures of the shackled defendant; they also related interviews of persons who knew defendant and interviews of families of the victims. There were also news stories that focused on how forensic medical personnel identified unknown bodies through dental charts.

The sensationalism of this publicity was fed by the prosecutor himself. The prosecutor established a telephone "hot-line" number to receive calls from anyone with information about the murders or defendant and gave this significant publicity. Moreover, the press was specifically invited by the prosecutor to witness and report on investigations involving defendant. By the prosecutor's own admission, some 200 reporters went to defendant's mother's house on Staten Island to observe and report on digging operations for bodies at that site. The prosecutor also held several press conferences. During one press conference a victim's clothes, jewelry and dental charts were brought and were photographed and reported by the media. In another press conference the prosecutor clearly indicated that he believed that defendant was guilty. He also made numerous publicized comments concerning defendant's motive for the murders and the events leading to the murders, giving the impression that these matters were factually true. One article, headlined "[Prosecutor] hoping stab victim adds to Biegenwald profile," quoted the prosecutor as saying that investigators were concentrating on identifying a body "believed to be the fifth of [the defendant's] victims." (*See Asbury Park Press,* April 24, 1983 at 1, col. 1.) Among the prosecutor's oft-repeated statements to the press were that defendant murdered his victim "for the sheer pleasure of seeing her die" (*Asbury Park Press,* May 5, 1983 at 1, col. 4); "because he wanted to see someone die that night" (*Star Ledger,* May 21, 1983 at 1,

9); "I guess she wouldn't die til [*sic*] he shot her twice or more"; that four of his victims died because Biegenwald enjoyed killing people; and that he was a "perverted, sick individual" (*Asbury Park Press*, May 5, 1983 at 1, col. 4). As a result of such characterizations, defendant was referred to in headlines of the *Trenton Times* and *Daily News* as the "Thrill Killer." News coverage relating to defendant's involvement in these crimes was also presented on the radio and television.

In the wake of this adverse publicity, defendant brought a motion for a change of venue. The assignment judge denied this motion on July 29, 1983. However, the court did issue an order enjoining the prosecutor from making further comments to the press regarding non-indicted matters and from making inflammatory remarks of any kind. Nevertheless, the publicity again flared up on Sunday, November 13, 1983, the day before the trial began. On that day, the *Asbury Park Press* carried a front-page article on the upcoming trial, featuring a picture of the defendant, revealing his prior conviction, repeating the prosecutor's statements on lack of motive, and linking the defendant to five other murders in the area. It is undisputed that some jurors read newspaper accounts of the trial in the jury assembly room before they were empaneled. Thereafter, press coverage remained constant, continuing on a daily basis and relating the details of the jury *voir dire* examination and the trial itself. The entire trial was televised.

There was a tangible impact from this publicity on the jury-selection process. Defense counsel objected to empaneling the jury and sought a change of venue on the ground that the prejudice from this adverse pretrial publicity could not be overcome and, further, that the *voir dire* examination of jurors would itself be insufficient to establish a basis for a change of venue.[1] The trial court denied the motion, stating at one point

---

[1]On the first day of jury *voir dire*, November 14, the trial court denied several of defendant's motions relating to the empaneling of a jury. These

that if fifty jurors said their deliberations would be affected by the publicity, the defendant would have "an argument" for a change of venue. At another time, the court stated that it would not entertain the motion to change venue until after the *voir dire* and that it would not grant the motion unless 250 prospective jurors said they could not be impartial.

The *voir dire* procedure was undertaken by the trial court between November 14 and 18, 1983. The examination purported to address the problems created by the pretrial publicity.[2] The trial court instructed the prospective jurors not to discuss the case among themselves. The jurors were asked about the publicity to which they were exposed and whether such publicity would affect their determination of guilt. However, the trial court initially refused, over defendant's objection, to question jurors about the details they recalled from the pretrial press accounts they had read; the court indicated it would consider asking the jurors only whether they were thinking about all the indictments, since the press reported them together. Defense counsel then moved unsuccessfully for a mistrial on the grounds that jurors were being seated who would give consideration to other crimes and because the court refused to allow

motions sought to sequester the jury during the Thanksgiving week after jury selection but before the trial, and to allow the attorneys to conduct the *voir dire*. The court also refused to ask whether the juror's determination of guilt would be affected by defendant's choice not to testify unless the defendant, who had not yet decided whether to testify, made an election at that time.

[2]In connection with the general *voir dire*, the defense and prosecution attorneys were required to submit any additional questions they wanted to have the court ask the jury. The court made a few exceptions, however, allowing counsel to ask one or two follow-up questions. Prospective jurors were questioned about their family, education, occupation, prior contacts with law enforcement, whether they had been victims of crime, generally whether they could apply the law even if they disagreed with it, their feelings about capital punishment and ability to vote for the death penalty, whether they would automatically vote for a death penalty (if the juror's initial answer suggested this), and whether they would consider both the death penalty and life imprisonment as options in the penalty phase. Some prospective jurors were asked whether television cameras in the courtroom would bother them.

the attorneys to state their cause objections at side bar, outside the juror's hearing.

Before any peremptory challenges were exercised, sixteen jurors, who were not otherwise excused for cause, were seated. Throughout the *voir dire,* the court asked most jurors what they recalled; it sought to determine from their answers whether they knew about more than one murder or about defendant's prior conviction. Nevertheless, the court ruled that it would not excuse anyone for cause unless the juror expressly stated that he or she could not be impartial. Defense counsel again moved for a mistrial, claiming that the *voir dire* conducted by the trial court was an insufficient basis on which to exercise challenges in a capital case.

About half of each panel was excused at the outset because persons could not serve for the four to six weeks that the trial court estimated the case would last. Ninety-five prospective jurors were questioned before the final sixteen-member jury was seated.[3] Seven of these prospective jurors were excused, due to personal conflicts, before the court questioned the remaining jurors about what they read or heard about the case. Of the remaining eighty-eight who were questioned, forty-seven were exposed to significant pretrial publicity [4] and recalled

---

[3] Defense counsel thought the court would allow further *voir dire* after the initial 16 jurors were seated. After the first peremptory challenge was used, another juror was questioned outside the presence of jurors already selected, and so forth. When the first panel from the general jury assembly room was exhausted, a second panel was brought in and instructed by the court not to discuss the case. When this panel was exhausted, the third panel was called but was not similarly instructed; however, by this time only one more juror was needed to complete the jury. Each new panel waited in another unused courtroom that was apart from the *voir dire* proceedings and the general jury assembly room.

[4] Jurors who said merely they knew defendant's name, knew he was accused of the Olesiewicz murder, or other facts about this case were not considered exposed to significant pretrial publicity. Only jurors who expressly mentioned their recollection of several murders or bodies or that defendant had a prior murder conviction were considered exposed to significant pretrial publicity

specific details—usually that there were several murders, that bodies were found buried in Staten Island or Monmouth County or that the defendant had a prior conviction. Thirty-five of the forty-seven were excused by the court because they said they could not render an impartial judgment in light of what they knew. Four of the remaining twelve were seated over defendant's challenges for cause based on their exposure to publicity. Every challenge for cause made by the defendant was denied.

On the fourth day of *voir dire*, Ellen Pisnoy, a prospective juror, said that prior to the trial court's instructions to the panel, potential jurors had discussed the fact that defendant was accused of several murders and the role of Mr. Fitzgerald, one of the State's main witnesses. Fifty jurors had been questioned prior to this revelation but none had mentioned discussions among potential jurors. The trial court's attempt to identify the jurors involved in these discussions consisted only of the same random questioning of prospective jurors on *voir dire* and general questioning of each juror about what was said, and by whom, among the waiting jurors. The fifty-fourth prospective juror, Michelle Hugo, confirmed during *voir dire* that even after the prospective jurors were seated, jurors were comparing recollections of newspaper accounts about how the defendant lured young women to go with him, how he had murdered them, and how he had been turned in by his friend.

Three potential jurors, Ruth Cooper, Elizabeth Megill, and Anne Ennis, revealed that they had given other prospective jurors details of defendant's other alleged crimes. Ms. Cooper was specially called for questioning immediately after Ms. Hugo identified her, but Ms. Megill and Ms. Ennis were called as their numbers were randomly drawn from the box. These jurors were asked to identify those to whom they spoke, but the

since these matters were inadmissible at trial, except for the prior conviction at the sentencing phase.

court's questioning did not reveal all jurors who were thus exposed to the extra-judicial publicity.[5]

In all, nine persons who were exposed to significant pretrial publicity were seated with some members of the final jury before they were excused peremptorily by the defendant or State. That publicity was discussed extensively among prospective jurors, not all of whom were identified. One juror, Ms. Hugo, who knew nothing of the defendant before being called for jury duty but learned about several murders of young girls in courthouse discussions, served on defendant's jury. Before the last juror was seated, defense counsel exhausted all twenty peremptory challenges.

### B.

The primary issue generated by the extensive adverse pretrial publicity is whether this publicity was such that it jeopardized defendant's constitutional right to trial by a fair and impartial jury. In dealing with this kind of issue in the context of a capital murder prosecution, we have stressed the need, under our State Constitution, for a strict standard that would be fully protective of a defendant's significant jury rights in light of the importance of the interest at stake. *State v. Williams*, 93 *N.J.* 39 (1983).

---

[5]After Ms. Cooper was questioned, the jurors already seated on the jury were brought into the courtroom and asked, in Ms. Cooper's presence, if they had had discussions about the case or had spoken to Ms. Cooper. They denied such discussions. Then the general panel was brought in and Ms. Cooper identified those to whom she spoke, who, in turn, were questioned on bias. In Ms. Megill's case, she said 10 or 12 jurors were in her discussion group and had "come to conclusions already." She could name only two of those involved, however. These two were questioned the next day on bias and excused by the court. Ms. Ennis said she gave details of the crimes to about six potential jurors in the panel, but could recall only two names. One was questioned and excused on other grounds, while the other had been excused on the first day due to family illness. Neither the already-seated jurors nor the balance of the general panel was brought before Ms. Megill or Ms. Ennis so that others involved in the discussions could be identified.

The majority asserts that our review in this case is circumscribed because defendant, on this appeal, makes no complaint about the *voir dire* or about the trial court's rulings on his challenges for cause, and because defense counsel failed to renew his motion for change of venue at the conclusion of the *voir dire.* I would not find any bar to our consideration of this important issue because defendant may not have made a clear or continuing objection to the trial court's rulings. After all, "a life is at stake" and we will not pause "in the interest of justice to invoke the plain error rule ... and to reverse where the trial errors were impregnated with the likelihood of having harmed the substantial rights of the defendant." *State v. Mount,* 30 *N.J.* 195, 213 (1959).

The Supreme Court has recognized that the denial of the right to a fair trial by an impartial jury can involve two kinds of cases. One consists of situations in which the defendant must demonstrate actual prejudice in the jury. *See, e.g., Patton v. Yount,* 467 *U.S.* 1025, 104 *S.Ct.* 2885, 81 *L.Ed.*2d 847 (1984); *Dobbert v. Florida,* 432 *U.S.* 282, 97 *S.Ct.* 2290, 53 *L.Ed.*2d 344 (1977); *Murphy v. Florida,* 421 *U.S.* 794, 95 *S.Ct.* 2031, 44 *L.Ed.*2d 589 (1975); *Irvin v. Dowd,* 366 *U.S.* 717, 81 *S.Ct.* 1639, 6 *L.Ed.*2d 751 (1961); *Stroble v. California,* 343 *U.S.* 181, 72 *S.Ct.* 599, 96 *L.Ed.* 872 (1952). The other involves cases in which the community or trial atmosphere is so corrupted by detrimental publicity that prejudice is inferred. *See, e.g., Sheppard v. Maxwell,* 384 *U.S.* 333, 86 *S.Ct.* 1507, 16 *L.Ed.*2d 600 (1966); *Estes v. Texas,* 381 *U.S.* 532, 85 *S.Ct.* 1628, 14 *L.Ed.*2d 543 (1965); *Turner v. Louisiana,* 379 *U.S.* 466, 85 *S.Ct.* 546, 13 *L.Ed.*2d 424 (1965); *Rideau v. Louisiana,* 373 *U.S.* 723, 83 *S.Ct.* 1417, 10 *L.Ed.*2d 663 (1963); *Marshall v. United States,* 360 *U.S.* 310, 79 *S.Ct.* 1171, 3 *L.Ed.*2d 1250 (1959).

Our own test does not require a showing of actual prejudicial taint. This test is reflected in *State v. Williams, supra,* 93 *N.J.* 39, in which we ruled that the publicity must be such as to create the "realistic likelihood" that the defendant cannot obtain a fair trial before impartial jurors. The Court in *Williams*

considered the right of the press to attend the pretrial bail and probable cause hearing of the defendants charged with capital murder, as against the defendants' rights to a fair trial and impartial jury. The issue posed was whether the adverse publicity that would result from press access to such pretrial proceedings would irreparably impair the defendants' right to be tried by an impartial jury. We ruled that the standard for this determination is whether "the trial court is clearly satisfied that there is a realistic likelihood that the defendant's right to an impartial jury will be threatened by adverse publicity emanating from an open pretrial proceeding." *Id.* at 63.

In *Williams*, the Court was not required to determine the actual effect of adverse pretrial publicity. It was the potential or anticipated prejudice from adverse publicity—that would result from press coverage of pretrial proceedings—that was the focus of the Court's determination. In *State v. Bey*, 96 *N.J.* 625 (1984), a capital murder prosecution, the Court concluded that there was sufficient adverse pretrial publicity to jeopardize defendant's constitutional right to a fair and impartial jury. We ruled that the trial court erred in not conducting a hearing to determine, under the *Williams* standard, whether there was a "realistic likelihood" of prejudice from this publicity that would require a change of venue or other extraordinary corrective measures.

Courts have considered several factors in determining whether the prejudicial effects of pretrial publicity are sufficient to undermine the right to a fair jury trial. These are: (1) the nature and extent of publicity—whether factual, inflammatory or referring to matters which are prejudicial and inadmissible at trial; (2) the length of time between the dissemination of the publicity and the trial; (3) the care exercised and the difficulty encountered in selecting a jury; (4) the prospective and final jurors' familiarity with prejudicial, inadmissible information; (5) the resultant effect on the prospective and final jurors' ability to deliberate impartially; (6) the defendant's use of peremptory challenges to correct for publicity; (7) the prosecution's respon-

sibility for the publicity; (8) the nature of the crime; (9) the population from which the venire is drawn; (10) the efficacy of a change of venue; and (11) precautionary or curative measures taken by the trial court to alleviate the effects of publicity. *See* Annotation, *Pretrial Publicity in Criminal Cases As Ground For Change of Venue,* 33 *A.L.R.*3d 17, 33, 38–78 (1970) (Supp. 1986) (collecting cases); Ranney, *Remedies for Prejudicial Publicity: A Brief Review,* 21 *Villa.L.Rev.* 819, 829, 32 (1976); Note, *Community Hostility and the Right to An Impartial Jury,* 60 *Colum.L.Rev.* 349, 361–65 (1960). Such factors are illustrative of the circumstances that are relevant in determining whether the prejudicial effects of pretrial and trial publicity in a given case create the "realistic likelihood" that defendant could not otherwise obtain a trial by a fair and impartial jury. Consideration of the undisputed facts in this case, informed by such factors, leads to the conclusion that defendant's constitutional jury-trial right was undermined by this publicity.

As recounted, there was extensive prejudicial publicity about the defendant in newspapers distributed in Monmouth County during the spring and summer of 1983. When trial commenced in November, the publicity resumed and continued thereafter on a daily basis, while the jury remained unsequestered. The publicity was inflammatory and sensational rather than factual and objective. Particular prejudice inhered in newspaper articles that discussed several murders, in addition to the one for which defendant was being tried, and contained highly damaging and inadmissible information, such as the names, ages and locations of bodies of other murder victims. Further, the publicity was widespread and extensive; the same population that was exposed to the pretrial publicity constituted the source from which prospective jurors were drawn.[6]

---

[6]In 1980, Monmouth County's "over 18" population was 359,254. Its total population was 503,175. Its July, 1983 total population was 515,181, a slight increase over the 1980 figures. *See* N.J. Dept. of Labor, Office of Demographic and Economic Analysis, Official State Estimate, Population Estimates for New

This publicity was fueled by the prosecutor's widely publicized personal comments regarding critical matters bearing not only on criminal guilt but on culpability as well; such as defendant's absence of motive. As a result, the crime charged appeared especially shocking and the impact upon the public highly sensational. The actions of the prosecutor were intentional, not inadvertent, and surpassed any professional needs arising from the investigation and prosecution of the case itself. Indeed, this conduct violated the New Jersey Rules of Professional Conduct, 3.6. In *Matter of Rachmiel*, 90 *N.J.* 646 (1982), this Court construed the predecessor of this professional rule, Disciplinary Rule 7–107(B)(6), and concluded that it "prohibits an attorney involved in an ongoing criminal trial from making extra-judicial comments concerning the guilt or innocence of a criminal defendant or the quality of the evidence or merits of the case when such remarks are reasonably likely to interfere with a fair trial." *Id.* at 657. In my view, the comments about defendant's implication in other murders and his lack of motive for the murders and the prosecutor's production of physical evidence at the press conference cannot be condoned in light of this ethics stricture. *See In re Hinds*, 90 *N.J.* 604, 622–23 (1982).

Although this case is not an ethics proceeding, it is nonetheless clear that the prosecutor's conduct was not professionally justifiable or defensible; it was undoubtedly an added factor that contributed to the violation of defendant's constitutional rights. This form of prosecutorial misconduct must be weighed

---

Jersey: Revised Estimates, July 1, 1982 and Provisional Estimates, July 1, 1982 and Provisional Estimates, July 1, 1983 (Sept. 1984). Thus, jurors were drawn from an adult (over 18) population of Monmouth County of approximately 360,000 or slightly more, in 1983. The Monmouth County adult readership of the *Asbury Park Press*, in which the greatest number of prejudicial articles appeared, was 115,276 (daily) and 162,513 (Sunday) in 1982 and slightly higher, adjusted for the population increase, in 1984. Thus, as much as one-half of the population from which the jury pool was drawn was exposed to highly prejudicial information in the *Asbury Park Press* on the day before trial.

heavily against the State in assessing defendant's claim to a denial of constitutional rights and, more important, in determining what relief defendant is entitled to receive in order to repair the constitutional damage. *See State v. Sugar*, 84 *N.J.* 1 (1980).

The trial court did take some precautionary or curative measures, such as its imposition of a "gag order" and a short continuance of the trial. That the effect of the publicity was not overcome by these steps is evidenced by the news articles appearing the day before trial, repeating damaging and inadmissible information, including the prosecutor's inflammatory comments. In addition, as evidenced by the *voir dire* examination, *see supra* at 75–81, the publicity had a tangible impact on prospective and selected jurors.

The extent and nature of the publicity, as measured by the relevant factors, created the realistic likelihood that a fair and impartial jury could not be obtained. Absent effective corrective measures, defendant should have obtained a change of venue. The question, therefore, is whether the trial court's *voir dire* examination served to neutralize the effects of the prejudicial publicity and secure an impartial jury.

## C.

Courts have considerable flexibility in coping with the prejudicial effects of adverse publicity. The trial court may order an adjournment of the trial, a change of venue, or the empaneling of a foreign jury; they may also engage in a particularly thorough *voir dire* examination of prospective jurors. *See State v. Williams, supra*, 93 *N.J.* 39; *State v. Allen*, 73 *N.J.* 132, 161 (1977) (Pashman, J., concurring); *State v. Trantino*, 45 *N.J.* 37, 39–40 (1965). In *State v. Williams, supra*, 93 *N.J.* at 60–63, 67–68 n. 13, the premise of the discussion regarding juror taint and change of venue motions was that in cases preceded by extensive publicity, an "exhaustive and searching *voir dire*" is the linchpin necessary to empaneling impartial

jurors, particularly where pretrial motions to change venue and sequester the jury have been denied. *Id.* at 68–69, 71 n. 18. In this case, the trial court refused to sequester the jury or to order a change of venue, or to require a foreign jury. Moreover, its short continuance of the trial and its imposition of a gag order after several months of adverse publicity were ineffective and did not prevent the resumption of adverse publicity. We turn then to the question whether the *voir dire* examination was itself sufficient to overcome the severe prejudice generated by the adverse pretrial and trial publicity.

Our own appellate role must be understood. This Court has recognized the need for the independent and scrupulous evaluation of the *voir dire* examination by the appellate court to resolve the claims raised by adverse pretrial publicity. *See State v. Van Duyne,* 43 *N.J.* 369, 386 (1964). In *Sheppard v. Maxwell, supra,* 384 *U.S.* 333, 86 *S.Ct.* 1507, 16 *L.Ed.*2d 600, the Supreme Court has also considered the standard of appellate review where defendant complains that the community from which the jury was drawn was so tainted by publicity that due process and the sixth amendment were transgressed. The reviewing court must, in that situation, make an independent evaluation of the facts and circumstances regarding publicity and of the jury *voir dire* examination to determine whether the publicity was so pervasive and prejudicial or the jurors' professions of impartiality sufficiently doubtful that a new trial is required.

A corollary of this Court's ruling in *State v. Williams, supra,* is that if a defendant makes a showing of a realistic likelihood of prejudice from adverse publicity, he should be entitled to a change of venue. For that reason, we also considered in *Williams* the burden of proof necessary in order to secure a change of venue. In adopting the new standard of the "realistic likelihood" of jury taint, we specifically overruled the former test for a change of venue announced in *State v. Wise,* 19 *N.J.* 59, 73 (1955). That was "whether an impartial jury could be obtained from among the citizens of the county or

whether they are so aroused that they would not be qualified to sit as a jury to try the case." The operative standard now governing judicial review of a trial court determination that a defendant's right to an impartial jury was not violated and a change of venue was not required is the substantive test of *Williams* and the procedural test of *Van Duyne*. Our standard in this kind of case is the *Van Duyne* requirement of an independent appellate evaluation of the record, applying the *Williams* "realistic likelihood" test for determining whether the jury right has been violated and a change of venue is required.

In my opinion, an independent evaluation of the facts relating to the nature and extent of the adverse pretrial publicity makes it abundantly clear that there was a realistic likelihood that defendant could not receive a trial by a fair and impartial jury, and that, in the face of this adverse publicity, the *voir dire* efforts of the trial court were ineffective to neutralize the effects of the resultant prejudice. Thus, it is reversible error for the trial court not to have granted a change of venue.

In denying defendant's motion for a change of venue, the trial court obviously believed that the *voir dire* could be an effective antidote to the prejudicial publicity. The court relied simply on its own experience that every prospective juror would not have read every article or would forget what he or she read by the time the trial began. However, the prejudicial impact of adverse publicity on the jury became immediately evident. Both prospective and final jurors had become familiar with the case through the publicity, learning of both prejudicial and inadmissible information. As noted, more than half of the prospective jurors questioned about publicity recalled specific prejudicial, inadmissible information concerning defendant. The overwhelming majority of these jurors volunteered that they could not render an impartial decision. One juror who was finally seated knew that the defendant was accused of murdering several girls but nevertheless professed to be impartial.

Defendant argued at trial that the scope of the *voir dire* was not sufficiently exhaustive to reveal prospective jurors who knew and might be influenced by prejudicial and inadmissible information; as a result, defendant was unable to develop facts to demonstrate further the realistic likelihood of jury taint or to provide a basis on which to renew his change-of-venue motion after the *voir dire* examination or even intelligently to exercise challenges for cause during *voir dire.*

I find merit in this claim. The questioning of prospective jurors about publicity was, for the most part, too general to have elicited any acknowledgement from jurors that they knew of defendant's prior conviction or his connection to five murders. Initially, the court's questions proceeded directly from the juror's exposure to publicity to whether the juror could render an impartial verdict, without any inquiry as to what the juror had read or heard about the case.[7] Later, as a result of defense objections, and throughout the rest of the *voir dire,* the court asked each prospective juror what details he or she recalled from the publicity in connection with defendant's name and whether he or she recalled any background information about the defendant. However, if a juror did not mention defendant's prior conviction or link to other murders, the trial court simply went on to ask the juror only whether he or she would be impartial. There is a strong basis for finding this examination to be seriously deficient.[8]

---

[7]For example, prospective juror, Mr. Cross, said he read articles in the *Asbury Park Press* about the defendant, including a particular article that appeared the day before trial, which mentioned the prior conviction and link to other murders. Yet because Mr. Cross did not refer to any of these specific facts on *voir dire* and said he would be impartial, the trial court denied the defendant's challenge of Mr. Cross for cause.

[8]The ABA's "Standards Relating to Fair Trial and Free Press" are instructive as to the adequacy of *voir dire* for purposes of exposing the prejudice resulting from adverse publicity. They provide:

(a) *Method of examination.*

Related to the inadequacy of the *voir dire* to elicit traces of bias on the part of jurors is the failure of the trial court to excuse several jurors for cause. Defendant challenged six prospective jurors for cause on the grounds that their exposure to publicity relating to inadmissible information rendered their impartial deliberation highly improbable, if not impossible, regardless of their own belief in their impartiality. Four of these jurors mentioned information that indicated they knew defendant was accused of several other murders or that he had a prior murder conviction. Five other prospective jurors, whose statements indicated they knew the defendant was linked to several murders or that he had a prior murder conviction, were seated without the defendant challenging them for cause. Two were peremptorily excused by the defendant, two were excused by the state and one served on defendant's jury. The court questioned each of these nine prospective jurors and each juror professed that he or she could put aside the extraneous information and deliberate impartially.[9]

The general test for excusing a prospective juror for cause is whether there is a strong likelihood or probability, grounded in human experience, that such an individual will be, or will

Whenever there is believed to be a significant possibility that individual talesmen will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to his exposure shall take place outside the presence of other chosen and prospective jurors.... The questioning shall be conducted for the purpose of determining what the prospective juror had read and heard about the case and how his exposure has affected his attitude towards the trial, not to convince him that he would be derelict in his duty if he could not cast aside any preconceptions he might have.

*See* American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press 3.4(a) (approved ed. March, 1968) [hereinafter ABA Standards].

[9]The Appendix to this opinion, *infra* at 107, recounts the examination of these nine jurors. It is included to illustrate the inadequacy of the *voir dire* examination to ferret out the prejudicial effects of the pretrial publicity as well as to provide a basis for concluding there was a strong likelihood that these jurors had been prejudiced by pretrial publicity.

appear to be, prejudiced. The criterion is not whether the prospective juror's experience will necessarily or inevitably be prejudicial. *See State v. Jackson*, 43 *N.J.* 148, 157–58 (1964); *Wright v. Bernstein*, 23 *N.J.* 284, 295 (1957) (test is not whether irregular matter actually influenced the result, but whether it had the capacity for doing so).

The decision whether to excuse a prospective juror for cause lies within the discretion of the trial court because that determination is heavily dependent on a subjective evaluation of the juror's credibility. *See State v. Singletary*, 80 *N.J.* 55 (1979). Nevertheless, this Court can decide on appeal that particular circumstances present such a strong likelihood of prejudice that, as a matter of law, prospective jurors should have been excused. *See State v. Van Duyne, supra*, 43 *N.J.* at 386 (appellate court required to independently determine whether publicity so pervasive and prejudicial, or juror's protestation of impartiality so doubtful, that new trial is required); *State v. Deatore*, 70 *N.J.* 100, 105–06 (1976) (where juror had close relationship with victim, juror should have been excused); *State v. Jackson, supra*, 43 *N.J.* 148 (juror who was friend of key state witness should have been excused); *Wright v. Bernstein, supra*, 23 *N.J.* 284 (mistrial should have been declared in accident case in which juror's mother was plaintiff in unrelated personal injury case heard in court that day); *Panko v. Flintkote Co.*, 7 *N.J.* 55 (1951) (new trial required where juror learned amount of defendant's liability insurance during trial). A prospective juror's professions of impartiality, good faith, and fair actions are not necessarily controlling. *See Irvin v. Dowd*, 366 *U.S.* 717, 723, 81 *S.Ct.* 1639, 1642, 6 *L.Ed.*2d 751, 756 (1961) (jurors who thought defendant was guilty before trial should be excused for cause even though they said they would deliberate impartially).[10]

---

[10] The ABA Standards relating to empaneling fair juries address the tests for determining whether a juror exposed to adverse pretrial publicity should be excused for cause, *viz:*

It cannot be overemphasized that the substantive and procedural protections necessary to assure the vindication of a defendant's constitutional rights—under the State Constitution, particularly as enhanced by considerations of fundamental fairness—must be maximized in a prosecution for capital murder. *See State v. Ramseur, supra,* 106 *N.J.* at 369–382 (dissenting opinion). With respect to the cluster of rights surrounding the need for jury fairness, capital cases require a higher standard than that applied in ordinary cases or by the trial court here. *See State v. Williams, supra,* 93 *N.J.* at 61 (requirement of fairness and jury impartiality is heightened in cases in which the defendant faces death) (citing *Beck v. Alabama,* 447 *U.S.* 625, 637–38, 100 *S.Ct.* 2382, 2389–90, 65 *L.Ed.*2d 392, 403 (1980)); *State v. Jackson, supra,* 43 *N.J.* at 156; *State v. Mount, supra,* 30 *N.J.* at 213; *State v. Wynn,* 21 *N.J.* 264, 271 (1956). With respect to whether, in capital cases involving prejudicial publicity, jurors should reasonably be excused for cause, the Court in *Williams, supra,* 93 *N.J.* at 68–68 stated:

> The [trial] court could consider whether there should be a greater willingness to resolve doubts in favor of the defendant in excusing jurors for cause. Particularly in capital cases, the trial judge should exercise extraordinary care in the *voir dire* of potential jurors and could excuse for cause any juror who

---

(b) *Standard of acceptability.*

Both the degree of exposure and the prospective jurors' testimony as to his state of mind are relevant to the determination of acceptability. A prospective juror who states that he will be unable to overcome his preconceptions shall be subject to challenge for cause no matter how slight his exposure. If he has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his judgment will be affected, his acceptability shall turn on whether his testimony as to impartiality is believed. If he admits to having formed an opinion, he shall be subject to challenge for cause unless the examination shows unequivocally that he can be impartial. A prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession, or other incriminating matters that may be inadmissible in evidence, or substantial amounts of inflammatory material, shall be subject to challenge for cause without regard to his testimony as to his state of mind. [*See* ABA Standards, *supra,* 3.4(b).]

has been exposed to sensational prejudicial publicity, especially where such exposure is repeated and involves patently inadmissible evidence. (Footnote omitted.)

We added in *Williams, supra,* 93 *N.J.* at 61, that jurors who have formed an opinion as to guilt or innocence must be excused, and that "only if it is demonstrated that 'the juror can lay aside his impression or opinion and render a verdict based on the evidence' presented in court will extraneous exposure to the facts of the case not be grounds for automatic disqualification." *Id.* (quoting *State v. Sugar, supra,* 84 *N.J.* at 23, and *Dobbert v. Florida,* 432 *U.S.* 282, 97 *S.Ct.* 2290, 53 *L.Ed.*2d 344 (1977)).[11]

In my opinion, error was inherent in the trial court's refusal to excuse these nine jurors for cause. As already recounted, Ms. Hugo, a juror, knew defendant was implicated in other murders. In addition, the other eight prospective jurors—who shared Ms. Hugo's knowledge—sat with some of the actual jurors in the jury room for varying periods of time before being excused. Jurors knew about the defendant's prior murder conviction and that he was connected with or accused of several recent murders other than that for which he was being tried. This strongly suggests that inadmissible information may have come to the attention of the defendant's jury, serving to consciously or unconsciously influence the prospective jurors toward either the guilty verdict, the death penalty or both. Under these circumstances, there is an extremely strong likelihood, grounded in human experience, that such jurors would be prejudiced despite their sincere belief in their own impartiality.

---

[11]This standard is comparable to the ABA standards that call for a reasonable likelihood test and require no showing of actual prejudice in the jury. The ABA standards also provide that where a motion to change venue is made or reconsidered after the jury is selected, the fact that the jury satisfies prevailing standards of acceptability is not controlling if the record shows that the reasonable likelihood standard was met. *See* ABA Standards, *supra,* 3.2. *See* discussion, *supra,* at 91–92 n. 10.

*See Irvin v. Dowd, supra,* 366 *U.S.* 717, 81 *S.Ct.* 1639, 6 *L.Ed.* 2d 751.[12]

As a result of the trial court's erroneous failure to excuse jurors for cause, defendant was required to use peremptory challenges to remove jurors. All of defendant's peremptory challenges were exhausted. By forcing defendant to use his peremptory challenges to excise the effects of prejudicial publicity from the jury, the trial court denied defendant his full complement of peremptory challenges. It is practically axiomatic that the denial of a peremptory challenge is the denial of a substantive right. *See State v. Singletary, supra,* 80 *N.J.* at

---

[12]The psychological and social science research on the effects of publicity on juror prejudice is not entirely conclusive, but casts serious doubt on whether jurors can ignore prejudicial information relating to the defendant obtained outside the courtroom despite curative instructions. At least two studies posit that jury instructions can eliminate or reduce the effect of prejudicial publicity on jurors' deliberations. *See, e.g.,* Simon, "Does the Court's Decision in Nebraska Press Association Fit the Research Evidence on the Impact on Jurors of News Coverage?," 29 *Stan.L.Rev.* 515 (1977); Kline and Jess, "Prejudicial Publicity: Its Effect on Law School Mock Juries," 43 *Journalism Q.* 113 (1966). However, other studies indicate that such cautionary instructions are ineffective or counter-productive. *See, e.g.,* Padawer-Singer, Singer & Singer, "Voir Dire by Two Lawyers: An Essential Safeguard," 57 *Judicature* (1974); Padawer-Singer & Barton, "The Impact of Pretrial Publicity on Jurors' Verdict," *The Jury System in America: A Critical Overview* (Simon ed. 1975); Doob, "Evidence, Procedure, and Psychological Research," *Psychology and the Law: Research Frontiers* (Berman, Nemeth & Vidmar, eds., (1976)); Sue, Smith & Caldwell, "Effects of Inadmissible Evidence on the Decisions of Simulated Jurors: A Moral Dilemma," 3 *J. Applied Soc. Psych.* 345 (1973); Sue, Smith & Gilbert, "Biasing Effects of Pretrial Publicity on Judicial Decisions," 2 *J.Crim. Justice* 163 (1974); Tons & Chaffee, "Pretrial Publicity and Juror Prejudice," 43 *Journalism Q.* 647 (1966); Wolf & Montgomery, "Effects of Inadmissible Evidence and Level of Judicial Admonishment to Disregard On the Judgment of Mock Jurors," 7 *J. Applied Soc. Psych.* 205 (1977); Oros & Ellman, "Impact of Judge's Instructions Upon Jurors' Decisions: The Cautionary Charge in Rape Trial," 10 *Representative Research Soc. Psych.* 220 (1977); Broder, "The University of Chicago Jury Project," 38 *Neb.L.Rev.* 744 (1959). The foregoing studies suggest that rather strong empirical evidence exists for the proposition that jurors are influenced by prejudicial publicity and carry that bias into jury deliberations, regardless of the court's instructions or their sincere belief in their own impartiality.

62–63. Moreover, in a capital murder prosecution, the loss or diminution of this right is more significant than in an ordinary criminal trial. The Court may suffer the reduced right in an ordinary case, *e.g., State v. Singletary, supra;* it should not countenance it when a defendant's life is at stake.

Finally, as related to the deficiencies of the *voir dire,* defendant contends that the trial court improperly denied his requests to hear challenges for cause, due to exposure to pretrial publicity, out of the hearing of the prospective juror who was being challenged. Defendant asserts that the act of openly challenging a juror's claim of impartiality prejudiced the juror against the defendant.

I do not consider this a picayune or captious complaint. When the seventh prospective juror, Mr. Cross, was questioned, he said he would be impartial although he had read prejudicial news stories. The court refused to ask defense counsel's follow-up questions or to allow him to challenge the juror at side-bar. Defense counsel then challenged the juror for cause, in his presence, which challenge was denied. Two more jurors, the fourteenth and fifteenth, Mr. Allocco and Ms. Herron, posed similar problems. Defense counsel requested that he be allowed to state his reasons for challenge on the record at side bar, out of the hearing or presence of the jurors. The requests were denied, as were the subsequent challenges for cause. Defense counsel then moved for a mistrial based on the alleged improper ruling on the cause challenge, as well as the asserted prejudicial effect of challenges made before the jurors. The trial court denied the motion for a mistrial, and defense counsel subsequently excused peremptorily each of these jurors.

Concededly, to the extent the trial court's rulings were discretionary, the defendant must demonstrate that the court was mistaken in the exercise of this discretion. *See State v. Smith,* 55 *N.J.* 476 (1970). Here, it is clear that there was an abuse of

discretion.[13] The defendant took the position consistently in pretrial motions and throughout the *voir dire* that there were many prospective jurors who knew of defendant's link to at least four other murders. With respect to the examination of three jurors, defense counsel was required to express, in their presence, his reasons for believing they could not be impartial even though they obviously believed that they could be. In effect, defense counsel was forced to argue before these jurors that he did not find them credible and that they should not be believed. Moreover, defense counsel was curtailed in stating his objections and compelled to present his position elliptically in order not to offend the jurors and to avoid reinforcing what the jurors already suspected or knew about the murders. Finally, defendant had to be guarded in his remarks in order to minimize the risk that they would be publicized in the press.

It is not illogical or imaginary to conclude that the psychological conditioning resulting from a challenge may act subconsciously to impede a juror's ability to reach a verdict solely upon the evidence before him. *See State v. Simon*, 79 *N.J.* 191, 199–202 (1979). Here, the trial court's decision to hear cause challenges in open court in the presence of the challenged juror adds to this negative influence. The evidence of mistake is

---

[13]In *State v. Smith, supra*, 55 *N.J.* 476, the first time counsel asked to make a challenge for cause at the bench he was permitted to do so and the challenge was sustained, the second time the trial court told him to make his challenge in open court and it was also sustained. On appeal, this Court observed that the trial court, knowing its probable ruling in the second instance, may have wanted to save time. Later, defense counsel made challenges for cause without requesting permission to come to the bench. When at one point counsel said that he felt compelled to exercise peremptory challenges because the court had instructed him "that challenges for cause could not be heard at side bar," the trial judge said "I did not say that." *Id.* at 483. Later, when counsel asked, he was again permitted to come to the bench for the purpose of making a challenge for cause. This Court concluded that the trial court had not made any general ruling prohibiting challenges for cause at side bar, that the subject was within the trial court's discretion, and that no prejudice to the defendant had been shown. *Id.* In this case, the trial court not only barred side bar conferences, it refused to excuse the challenged jurors for cause.

confirmed by the fact that the State agreed with defendant that such challenges for cause should be heard out of the presence of jurors and the court eventually relented.

In my view defendant's challenges for cause were erroneously denied; the incremental prejudice attributable to juror challenges for cause in the presence of the challenged juror merely adds to the reasons for reversal attributable to the inadequacy of the *voir dire* examination.

### D.

In sum, it is abundantly clear that there was massive detrimental pretrial and trial publicity that was so prejudicial it created the realistic likelihood that defendant could not obtain a trial by a fair and impartial jury. The violation of defendant's constitutional rights was more egregious because the State, through the prosecutor, intentionally encouraged and added to the pretrial publicity. This not only underscores the violation of the constitutional right, but also influences the nature of the relief to which defendant is entitled. Defendant was entitled under the circumstances to a change of venue.

Since the trial court did not order a change of venue, the violation of defendant's constitutional right to a fair and impartial jury went unrepaired. The procedures leading to the empaneling of the jury were wholly ineffective to overcome the impact of prejudicial publicity or to surmount the realistic likelihood that a jury could not fairly and impartially try the defendant. It further appears that defendant was forced to exercise all peremptory challenges to excuse jurors who should have been removed by the court for cause and that this was a denial of defendant's full opportunity to secure a fair and impartial jury. The risk of jury bias was further increased by instances in which defense counsel was improperly compelled to argue grounds for the excusal for cause in the presence of jurors.

For these reasons, I conclude that defendant did not obtain a trial before a fair and impartial jury. His conviction of murder and death sentence must be reversed.

## II.

The Court reverses the defendant's death sentence. It determines that there were several errors that seriously prejudiced the sentencing proceedings which mandate a reversal of the death penalty. It nevertheless concludes that defendant may be retried as to sentence and that he again may be exposed to the imposition of the death penalty. The Court, in my opinion, neglects to apply constitutional principles of double jeopardy and precepts of fundamental fairness, which under the circumstances presented, bar a retrial for purposes of seeking the imposition of the death penalty.

At the penalty phase of the trial, the prosecutor sought to have the jury consider whether two aggravating factors had been established by the evidence. One aggravating factor was defendant's prior conviction for murder, section c(4)(a); the other was that the murder was outrageously or wantonly vile, horrible or inhuman, section c(4)(c). With respect to the aggravating factor under c(4)(a), the prosecutor submitted in evidence a certified copy of defendant's 1959 murder conviction. The prosecutor offered no additional evidence to establish the aggravating factor under c(4)(c), relying upon the evidence that had been adduced at the guilt-phase of the trial. In support of aggravating factor c(4)(c), the prosecutor in summation argued that four bullet wounds to the head constituted an aggravated battery.

At the sentencing phase of the trial, the defense focused entirely on establishing mitigating factors. Defendant presented a forensic psychiatrist who had made a complete evaluation and diagnosis of defendant during three visits in October and November, 1983. He testified that defendant suffered from a severe personality disorder known as anti-social personality

with paranoid traits. He stated that as a result of this disorder, defendant lacked the capacity to appreciate the wrongfulness of his acts or to conform his conduct to the requirements of the law. On summation, the defense counsel stressed defendant's mental illness as well as his personal history.

In its charge to the jury, the trial court explained that aggravating factors must be found beyond a reasonable doubt, but that the jury had only to be "satisfied" that a mitigating factor existed. The court further instructed the jury, over the prosecutor's objection, that all of the mitigating factors had to be weighed against each aggravating factor proved. However, the court did not instruct the jurors that in order for the death penalty to be imposed they must find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors. As the majority points out, the trial court's charge with respect to the burden of proof and the weighing of aggravating and mitigating factors was in error, requiring a reversal of defendant's death sentence. *Ante* at 53–67.

The prosecutor, as noted, took the position that defendant was guilty of capital murder deserving the death penalty because he committed an aggravated battery in the course of murdering his victim, thereby satisfying c(4)(c). The trial court instructed the jury that to find this aggravating factor, the jury must conclude that the murder "involved either torture or conduct indicating a depraved mind or ... was so savagely outrageously cruel and violent that the adjectives wantonly, vile or horrible or inhuman are justified." In other words, the trial court simply reiterated the language of the statute, without further definition or explanation. Moreover, the court did not explain what constitutes aggravated battery.

After deliberating for an hour, the jury requested an additional explanation of aggravating factor c(4)(c). The court replied that in order to satisfy c(4)(c), only one of the three conditions—torture, depravity of mind, or an aggravated battery—had to exist. After several more hours, the jury re-

turned a verdict. The jury found that both of the charged aggravating factors existed beyond a reasonable doubt. As to mitigating factors, it found that the defendant was not under the influence of extreme mental or emotional disturbance, but that his capacity to appreciate the wrongfulness of his act or to conform his conduct to the requirements of the law was significantly impaired as a result of mental disease or defect. In addition, the jury found that another factor or factors relating to the defendant's character or record or to the circumstances of the offense also constituted a mitigating factor. Finally, the jury found that neither aggravating factor was outweighed by the combination of mitigating factors. Consistent with the trial court's instructions, this verdict led to a sentence of death.

The theory of the prosecution in this case was that the aggravating factor of c(4)(c) was satisfied because the murder was accompanied by an aggravated battery. This Court now rules that "aggravated battery" means serious physical harm or severe pain to the victim by means of an act that precedes death and does not serve to cause death instantaneously. *See State v. Ramseur, supra,* 106 *N.J.* at 207–209. The Court concludes that the evidence of an aggravated battery was insufficient. I agree.

Contrary to the State's contention, under the facts of the present case, evidence of four bullet wounds to the head is insufficient to establish an aggravated battery for purposes of determining capital murder. In *Patrick v. Georgia,* 449 *U.S.* 988, 101 *S.Ct.* 522, 66 *L.Ed.*2d 285 (1980), the Supreme Court vacated the defendant's death sentence where the defendant struck the victim six times in the head, but it was impossible to tell which blow killed him; the Court ruled that there was insufficient evidence of battery. The majority properly holds that there was insufficient evidence of an aggravated battery for the jury to conclude that the aggravating factor of c(4)(c) was established. *Ante* at 50.

Nevertheless, the Court rules that there was sufficient evidence to show that the defendant committed this murder with "depravity of mind," and that this would satisfy aggravating factor c(4)(c). In the companion case of *State v. Ramseur, supra,* 106 *N.J.* 123, the majority explains that "depravity of mind" can consist of several states of mind or mental conditions, and can be found without any evidence of torture or an aggravated battery. *Id.* at 208–210. In this case, the Court would define depravity of mind as existing when "the only purpose defendant had in killing the victim was to enjoy the act of killing itself and that he had no other reason for killing Ms. Olesiewicz other than wanting to kill." *Ante* at 50. For the reasons expressed in my dissenting opinion in *Ramseur,* I believe that the Court's definition of "depravity of mind" is utterly vague and incapable of reliable and consistent application. *Ramseur, supra,* 106 *N.J.* at 400–402 (Handler, J., dissenting).[14] Be this as it may, under the circumstances of this case, I am satisfied that it would violate double jeopardy and fundamental fairness to retry defendant for the purpose of seeking to impose the death penalty.

---

[14]The Court's definition of "depravity of mind" does not follow the original rule of the Georgia courts that required a state of mind that led the murderer to commit torture or an aggravated battery on the victim before death. *See Godfrey,* 446 *U.S.* 420, 431, 100 *S.Ct.* 1759, 1766, 64 *L.Ed.*2d 398, 408 (1980). Instead, the Court's interpretation more closely resembles Florida's construction of its "heinous" factor: "a conscienceless or pitiless crime." *See State v. Dixon,* 283 *So.*2d 1 (Fla.1973). However, even under Florida law, the murder in this case might not be considered "heinous." In *Jackson v. State,* 451 *So.*2d 458 (Fla.1984), the defendant picked up McKay for a drive and shot him in the back; the defendant put McKay in a plastic bag and placed him in the trunk apparently while he was still alive. McKay was later shot again and the body dropped off a bridge; the record contains no evidence that McKay remained conscious for more than a few moments after the first shot. It was held that McKay was incapable of suffering to the extent contemplated by this aggravating circumstance. In *Clark v. State,* 443 *So.*2d 973 (Fla.1983), the defendant shot a disabled elderly woman in head and she later died; there was no evidence that she was conscious after being shot, or in any pain. The Court ruled that helpless anticipation of impending death for an instant is insufficient to establish this aggravating factor.

The State's theory was that the murder was committed under circumstances that demonstrated "[t]he murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim," constituting the aggravating factor c(4)(c). The prosecutor relied primarily if not exclusively upon evidence of "an aggravated battery" to establish that the crime was "outrageously or wantonly vile, horrible or inhuman." The majority sets aside the jury verdict finding that the murder was outrageously or wantonly vile, horrible or inhuman because it was based upon insufficient evidence of aggravated battery. Nevertheless, the Court authorizes a retrial of defendant to enable the State once again to try to establish that the homicide was a c(4)(c) capital murder.

The State should not be permitted to retry the defendant for a crime as to which we have ruled the evidence at the first trial was insufficient. Double jeopardy principles clearly prohibit the State from retrying a defendant for the same crimes based upon evidence that was itself insufficient. This is firmly established as a matter of federal double jeopardy doctrine. *See, e.g., Brown v. Ohio,* 432 *U.S.* 161, 97 *S.Ct.* 2221, 53 *L.Ed.*2d 187 (1977); *Blockburger v. United States,* 284 *U.S.* 299, 52 *S.Ct.* 180, 76 *L.Ed.* 306 (1932). We have similarly recognized the bar of double jeopardy against successive prosecutions for essentially the same crime. *State v. Tropea,* 78 *N.J.* 309 (1978); *State v. Lynch,* 79 *N.J.* 327 (1979). Double jeopardy as a matter of federal constitutional law also has been held to apply to the specific context of the sentencing phase of a capital murder trial. *See Bullington v. Missouri,* 451 *U.S.* 430, 101 *S.Ct.* 1852, 68 *L.Ed.*2d 270 (1981).

The Court, however, determines that there was other evidence to establish c(4)(c), namely, evidence constituting "depravity of mind." But because this evidence was improperly presented to the jury to support the aggravating factor c(4)(c), the Court sets aside the jury's finding of the aggravating factor. The Court concludes that a retrial to establish a c(4)(c)

murder relying on this evidence would not run afoul of double jeopardy. I disagree.

To allow the State in this case another opportunity to establish defendant's homicide as c(4)(c) capital murder would be to retry defendant for the same crime that was the object of the first prosecution. I think it is indisputable that under our capital murder-death penalty statute the aggravating factors are essential elements of the crime of capital murder. Unless a murder is shown to have been committed under circumstances constituting an "aggravating factor" under the death penalty statute, it will not constitute "capital murder" for which the death penalty may be imposed. As I pointed out in my dissenting opinion in *Ramseur:* "The aggravating factors act as specifications of the class [of capital murder]; they form, in effect, *elements of the offense* defendant must have committed to come within the class." *Ramseur, supra,* 106 *N.J.* at 393 (Handler, J., dissenting) (emphasis added). The majority itself recognizes that the aggravating factors constitute elements of the offense of capital murder, "that functionally the aggravating factors in the Act are indistinguishable from the elements of a crime." *Ramseur, supra,* 106 *N.J.* at 226 n. 27. *See Arnold v. State,* 236 *Ga.* 534, 224 *S.E.*2d 386 (1976); *State v. Silhan,* 302 *N.C.* 223, 275 *S.E.*2d 450 (1981). "Capital murder" embraces a unique degree or quality of culpability. The level or quality of culpability for capital murder is defined by the "aggravating factors." Hence, under the Code of Criminal Justice aggravating factors are "element[s] of an offense", defined by the Code to mean the "conduct" or "attendant circumstances" "as [e]stablishes the required kind of culpability." *N.J.S.A.* 2C:1–14h. *See State v. Goodman,* 92 *N.J.* 43 (1983).

Under well-settled principles of double jeopardy, the subsequent prosecution for an offense that is based upon the same elements involved in an earlier prosecution is barred. *See State v. Dively,* 92 *N.J.* 573 (1983). Here there is no material differ-

ence as to the elements of the crime that will be retried—it is capital murder as defined by the aggravating factor of c(4)(c).

The State should not succeed in its argument that on retrial it seeks to rely on evidence of "depravity of mind" rather than of "aggravated battery" to establish c(4)(c). That cannot make a difference in this case. To the extent the evidence earlier relied on was found to be insufficient to support an aggravating factor that would elevate murder to capital murder, the result must be deemed to have been an acquittal of the death penalty, surely barring a retrial to reestablish that aggravating factor. *See Bullington v. Missouri, supra,* 451 *U.S.* 430, 101 *S.Ct.* 1852, 68 *L.Ed.*2d 270. With respect to the contention that the State will rely on other—sufficient—evidence on a retrial, the answer to this assertion is that the State still seeks to retry defendant for the *same* crime, namely, a c(4)(c) murder. Double jeopardy applies here because it applies to bar a successive prosecution of either the same crime and or a crime that has the same elements of the earlier offense. *See State v. Dively, supra,* 92 *N.J.* 573. It may be that the evidence to prove that a murder is "vile, horrible or inhuman" may vary. It can consist of proof of torture, or depravity of mind, or aggravated battery. Nevertheless, the crime itself is not different depending on differences in evidence; in other words, c(4)(c) capital murder has but one essential element or "aggravating factor." Thus, just as the State may not in any other context retry a defendant for the same crime, the State should not in the context of a capital murder prosecution be given an opportunity to retry defendant for purposes of establishing the *same* aggravating factor.

I am convinced that the views articulated by Justice Marshall in his dissent in *Poland v. Arizona,* —— *U.S.* ——, 106 *S.Ct.* 1749, 90 *L.Ed.*2d 123 (1986), express the principles of double jeopardy that must apply, under our State Constitution, in a capital murder prosecution in these circumstances. There, as here, aggravating factors function as specifications of the class of capital murder and, in effect, form elements of the offense.

The Supreme Court held that a resentencing hearing in a capital case is not barred by double jeopardy when the appellate court rejects the sole aggravating factor found by the sentencer; the Court ruled that the failure of the sentencer to find other alleged aggravating factors is not an "acquittal" of these factors for double jeopardy purposes. In dissent, Justice Marshall stated: "In no other circumstance would the Double Jeopardy Clause countenance the offer of a second chance to the State and the trial judge to find a better theory upon which to base a conviction." *Id.* at ——, 106 *S.Ct.* at 1758, 90 *L.Ed.*2d at 136 (Marshall, J., dissenting). We ourselves would not countenance a retrial in such circumstances. *State v. Tropea, supra; State v. Lynch, supra.*

Under these circumstances, principles of double jeopardy and fundamental fairness prohibit the State from trying defendant again to attempt to establish that the murder is a c(4)(c) capital offense.[15] For reasons similar to those I expressed in *State v.*

---

[15]Under the facts of this case, I think it would be contrary to fundamental fairness to subject defendant to another sentencing hearing, even if the State were to base its request for the death penalty only on the prior conviction aggravating factor, c(4)(a).

The Court has found that the trial court's instructions regarding the c(4)(c) aggravating factor were improper and that the evidence at the trial did not support the jury's finding of the c(4)(c) aggravating factor. The jury did find that aggravating factor c(4)(a) also applied to defendant and that this factor alone was not outweighed by the mitigating factors. This fact, however, would not be determinative on a retrial as this Court has held that the State must meet a higher burden of proof: that the aggravating factors must outweigh the mitigating factors *beyond a reasonable doubt. Ante* at 53. Also, the jury's finding must be considered to have been tainted by "the potentially prejudicial influence that an unsupported instruction could well wield in jury deliberations." *State v. Christener,* 71 *N.J.* 55, 71 (1976).

Without this taint, the jury may have reached a different weighing regarding the mitigating factors and the one remaining aggravating factor. The trial court's error thus deprived defendant of an opportunity to secure a jury finding that could have avoided the death penalty. When the State acts improperly in the sentencing phase of a capital case, fundamental fairness requires that the State not be allowed to subject the defendant again to the risk of being

*Ramseur,* I would bar a retrial seeking the death sentence and enter a judgment of life imprisonment.

### III.

I have already expressed at length my reasons for concluding that the capital murder-death penalty statute is unconstitutional. *See State v. Ramseur, supra,* 106 *N.J.* at 345–408 (Handler, J., dissenting). These reasons, in my estimation, fully apply to this prosecution and would warrant a reversal of the conviction and death sentence.

In this case additional compelling reasons call for such reversal. The massive highly prejudicial pretrial and trial publicity, unjustifiably aggravated by the prosecutor's misconduct in publicizing the case, rendered impossible a trial by a fair and impartial jury in the vicinage. The court failed to take any effective measures to cure the prejudice occasioned by the publicity. Further, because of the errors involved in the presentation of evidence and jury instructions in the sentencing phase of the trial, defendant, on grounds of double jeopardy and fundamental fairness, should not again be retried for purposes of imposing the death penalty.

The significance of this case impels me to make an added observation. Murderers like Richard Biegenwald pose the greatest challenge to the fairness, impartiality and integrity of our judicial system. The terrifying personalities of such murderers, their inscrutable compulsions, their seemingly irrational, random actions take more than their victims; they exact a debilitating toll on all of society, reducing to nothing the most cherished right of life itself. A public perception that our legal system leaves society unprotected against such people, or fails to register society's outrage at their actions, undermines both

---

sentenced with death. *See State v. Ramseur,* 106 *N.J.* 460–468 (1987) (Handler, J., dissenting).

respect for the Constitution and, ultimately, belief in the values embodied in the Constitution.

This kind of case puts the judiciary to supreme tests. It exposes judicial attitudes as well as judicial principles. It shows that noble principles are not enough. Principles can be betrayed by a want of conviction. Principles of law serve us only in their application; wrong applications are no better than unjust principles. Here the principles that we summon are those that recognize the importance of individual life and the need for scrupulous protections before a life—any life, including that of an unrepentant murderer—can be taken by the State. One such protection has to do with a fair and impartial jury. The assurance of a fair and impartial jury is not easy to achieve. Vigilance requires that community outrage over a defendant's crimes not be allowed to infect the jury that will deliberate the defendant's fate, particularly where life is at stake. We are guided by that principle here. We falter in its application, however, when we allow a defendant to be tried before a jury in which the risk of prejudice is so real. Justice is disserved as much by a failure to follow right principles as by a failure to recognize them.

## APPENDIX

There follows excerpts of the *voir dire* of nine jurors who knew about defendant's prior conviction or other murders but were accepted by the trial court based on their expressed belief that they could deliberate impartially. The *voir dire* examination of these jurors is recounted in detail to illustrate the inadequacy of the *voir dire* in light of the massive adverse pretrial and trial publicity.

### (a) *Ms. Herron*

Mary Herron originally stated that she had some knowledge of the case and recognized the defendant's name in connection with what she read in the *Asbury Park Press*.

[THE COURT] Q: Do you recall reading anything in the newspapers that you told us about Mr. Biegenwald's prior background?

[THE JUROR] A: Yes. There was some mention of that.

Q: What you you recall being mentioned?

A: That he had previously been arrested for a crime and also in his childhood he had—I think I may have read that he had been institutionalized as a child or a young person.

The Court then asked Ms. Herron seven questions to determine whether she would be affected by what she knew; she maintained that she would not and volunteered that she didn't believe everything she read in the newspaper and that there were two sides to every Story. At the end of Ms. Herron's *voir dire* defense counsel asked for additional questions about what else the veniremember recalled.

[THE COURT] Q: If there is anything more you recall about reading about it in the newspapers, tell us.

[THE JUROR]: About this particular case?

MR. DIAMOND: About Mr. Biegenwald.

A: I did hear on the radio some time after the original arrest, the incident on Staten Island I heard on the radio news.

Q: Something on Staten Island?

A: Yes. But that's all.

Q: In my questions to you I was trying to have you include everything that you have heard having to do with Biegenwald.

A: No. It was really like a second time I heard something pertaining, you know, to him.

Q: What did you hear then?

A: In fact I turned on the tail end of of it, that there was some digging in Staten Island and the name was mentioned, but—

Q: Anything again that may have been mentioned then about Mr. Biegenwald's background?

A: Not at that time, no.

Q: And the only background that you did hear was that which you read in the newspaper that you have repeated to us already?

A: Yes.

Q: All right. The questions I asked before about affecting your judgment, I certainly mean them to include anything you have ever heard on the radio or read in the newspaper. Did you understand them that way?

A: Yes, I did.

THE COURT: Okay, Mr. Diamond?

MR. DIAMOND: I'd just like to know a little bit more about what she knows as to the digging in Staten Island, your Honor.

THE COURT: I won't inquire. If you wish to exercise a challenge for cause, I will hear that.

In open court defendant challenged Ms. Herron for cause on the ground that she would give consideration to other crimes committed by the defendant based on her statement about the diggings on Staten Island. The trial court summarily denied the challenge. Defendant peremptorily excused Ms. Herron two days later.

(b) *Mr. Forse*

James Forse, Jr. had read articles, although not recently, in the *Asbury Park Press* about the case.

[THE COURT] Q: What do you remember reading? What sticks out in your mind? There were a lot of things in the paper, but what do you remember? [THE JUROR] A: Well, the case in Ocean Township was the one that I remember mostly.

Q: What do you remember of it?

A: About the girl being found in the back of the—the fast food place in Ocean Township.

Q: And do you recall any of the names that were mentioned in connection with that in the newspapers?

A: Only the name of the girl, and I think Fitzgerald and the defendant.

Q: Do you recall any details about Mr. Biegenwald's background that you may have read in the papers?

A: No, not too much I don't think, no. Yes, I recall the fact that he had been convicted and served time for a crime.

The trial court then asked Mr. Forse four questions to determine whether what the juror knew from the publicity would have any effect on his deliberations. Mr. Forse maintained that he would not be affected. Defense counsel challenged Mr. Forse for cause on the grounds that he knew about the defendant's prior conviction although the defendant was not going to testify and that he knew specific facts of this case from the newspaper. The court said that, in its evaluation, the juror was sincere, that he has thought about it and that that's the best that can be asked of a human being. Counsel argued that the juror would not ignore that knowledge. Alternatively, defense counsel requested that the court inquire further about the publicity and the nature of prior conviction. The State agreed

although it maintained that knowledge of a prior conviction is not grounds for excusing a juror for cause.

BY THE COURT:

Q: Mr. Forse, we are interested in one area, and that is you said that you have read in the newspapers that Mr. Biegenwald had a prior conviction. Anything more specific than that in your mind?

A: Only that it was for murder.

Q: Now, you know obviously that's that and you know it. Do you think that is going to affect your ability to judge him in this charge, which is also a charge of murder?

A: No, I don't think so.

Q: That's a very important consideration, you know.

A: (Nodding affirmatively.)

Q: Before I forget, if per chance you are ultimately selected as a juror on this case, there should never be any discussions of that fact by anybody in the jury room.

A: I understand it.

Q: Unless the fact is something that comes out in this courtroom.

A: Yes.

Q: Because otherwise it is just rumor.

A: Um-hum.

Q: You understand?

A: (Nodding affirmatively.)

THE COURT: All right. With all the discussions in mind that we have had on the record, I will not grant the challenge for cause.

Defense counsel peremptorily excused Mr. Forse later that day.

### (c) *Mr. Supple*

Michael Supple stated that he had read about the case months before in the *Daily Register* and heard about it on the radio commuting to and from work.

[THE COURT] Q: Okay. From those sources what details do you recall? There is a lot of stuff thrown in the paper. Some stuff you hear on the radio. But what do you remember hearing?

[THE JUROR] A: Well, I remember hearing that they had arrested Mr. Biegenwald and that he was imprisoned and [ ] up in Staten Island there was some type of burial whatever, a burial area and a gentleman who was with him, an accomplice to some degree, a parent or relative, and just that they were—they had apprehended Mr. Biegenwald, and something about—I believe it was his wife, they have her detained, and she was pregnant or something along those lines.

I really didn't follow it diligently, but [ ] something like that.

Q: Do you recall any details about Mr. Biegenwald's background that you may have read or heard?

A: No, other than he lived in Asbury Park and—no, I don't really recall too much of it, sir.

The trial court then asked Mr. Supple four questions to determine whether what Mr. Supple knew about the defendant would affect his deliberations. The juror maintained that it would have no effect. Defense counsel requested that the court probe the juror about his reference to the defendant's being imprisoned and about the burial area in Staten Island. Defense counsel also indicated that he challenged the juror for cause, which was denied.

BY THE COURT:

Q: [ ] In the course of discussing what you had read in the papers or had heard you mentioned that Mr. Biegenwald had been in prison. Had you seen that?

A: No. I meant he was taken to prison.

Q: Taken to prison—

A: When he was apprehended.

Q: I thought that was the context in which you used it. Okay.

In Staten Island you mentioned something about a burial. What do you recall about a burial situation in Staten Island?

A: Ugh, the only thing I recall was that they and found bodies.

Q: Did you see anything on television or was that something you read in the newspaper?

A: I believe it was strictly the newspapers, sir.

Q: And then you also mentioned in connection with that something about accomplice.

What do you recall about that?

A: Well, what it could be considered as an accomplice is someone who—who Mr. Biegenwald was affiliated with.

Q: Someone who helped him out?

A: Someone who helped him out, an accomplice.

Q: That's what you meant by that?

A: Yes, sir.

Q: And do you recall a name? Do you associate a name with that accomplice?

A: No, sir.

Q: You do not?

A: (Nodding negatively.)

THE COURT: Okay. All right. I will rule that the challenge for cause be denied in connection with Mr. Supple....

Defense counsel peremptorily excused Mr. Supple the following day.

### (d) *Ms. Ellen Carroll*

Ellen Carroll originally stated that she had some knowledge of the case and recognized the defendant's name and face from the pictures and captions in the *Red Bank Register* or the *Star-Ledger*. She also recalled that defendant's wife had a baby.

[THE COURT] Q: Now, you say you recall little or nothing about what you read. What do you recall, if I were to press you for your memory of details?

[THE JUROR] A: It's hard to separate from what I recall from reading and what I have heard since I have been here.

Q: Try to do that and then we will ask you what you have heard since you have been here. But try to make the separation first.

A: Oh, if I'm not mistaken there is a young girl in her teens that was murdered. I remember—I recall a picture in the paper. They were digging up a yard and about Diane having the baby. But other than going into the nitty gritty of it, I wasn't really involved in it.

Q: Do you recall specifically any reference to Mr. Biegenwald's background?

A: No, I don't.

Q: Now, you say what you were told and what you heard when you go here. That means after you got here Monday morning. What did you hear?

A: I heard that he had been arrested for it.

Q: For what?

Now, wait a minute. Someone—somebody was shot before. Somebody was murdered before.

Q: What else did you hear, if anything?

A: He was on parole at the time that this happened. You hear so much. So much goes through—

Q: Well, all right. The so much that you heard, did you hear that before the jurors were brought up to this courtroom and I began telling them about the case?

A: No. I think they were talking about it before we were even selected for the case, because someone said this case was coming up.

Q: And that is when the discussion arose?

A: Then everybody of course has input.

Q: A buzz buzz kind of thing?

A: Um-hum.

The trial court then asked Ellen Carroll two questions to learn whether what she heard in the juror assembly room or what she read in the newspapers would affect her deliberations.

She maintained that it would not, volunteering that she would have to make her own decision.

At the end of Ellen Carroll's *voir dire*, defense counsel requested further questioning about defendant's prior murder conviction, what she learned from other jurors on the panel, and her statement about the yard being dug up to see if she knew there was more than one body. Except for the last, the court agreed to inquire.

BY THE COURT:

Q: [ ] You mentioned that when you first came here and people were saying something about the Biegenwald case and started talking about it—

A: Um-hum.

Q: (Continuing) somebody mentioned Mr. Biegenwald had another conviction, or what did they say to you?

A: Well, they had said—I can't repeat it word for word—that he had been in trouble before.

Q: You said something about parole.

A: And evidently he was on parole when this happened.
Now, I don't know if these facts are right. I'm just telling you what I heard.

Q: All right. Once you hear something it is there.

A: Um-hum.

Q: Do you think that having heard that, that if you sit as a juror on this case before the case even starts you might have a feeling that maybe he did something as far as this case is concerned, maybe it is so?

A: No. I'd have to hear the facts for myself.

Q: Okay.

A: To make my own opinion up. As I say, I have heard so much. You hear so much. People just are guessing at a lot of things.

Q: So much about this case?

A: About this case or any case or anything?

Q: People do talk.

A: People talk, um-hum.

Q: But you are saying to us whatever it was that you heard you could put aside?

A: I'd want to hear it from someone in authority, someone who I thought knew.

Q: And if you didn't hear it here in this courtroom you wouldn't, or would you, allow it to somehow or other intrude on your ultimate decision?

A: No. I'd have to hear it from someone who really knows what they are talking about.

Q: In this courtroom?

A: Um-hum.

Q: Because as far as a juror is concerned, anybody outside this courtroom hasn't the foggiest idea of what they are talking about.

A: You are right.

Defense counsel asked for further questions because the juror had heard "so much." The court refused and denied the challenge for cause on the grounds that the juror was not precommitted to any position. The defendant peremptory excused Ms. Carroll the following day.

### (e) *Ms. Patterson*

Sylvia Patterson knew from the *Asbury Park Press* that the defendant was accused of murder.

[THE COURT] Q: Do you recall ever hearing anything on the radio or seeing anything on television about the Biegenwald matter?

[THE JUROR] A: Yes.

Q: What do you recall seeing?

A: Just the Staten Island incident where they discovered whatever it was, you know. And, well, see, I don't watch the news that much. It was just on one of the channels. It was there and it caught your attention and you keep going and it's not—

Q: Do you recall any other details from what you have have read or what you may have seen on television other than what you have told us so far?

A: By details you mean, you know—

Q: Specifics as to what happened or what he is supposed to have done, that sort of thing, whatever the newspapers said as you remember it.

A: No, 'cause I don't even remember how many people it is he is supposed to have—you know, it's something once and it wore off. I didn't even think of it again.

Q: Do you as a person accept the proposition that when someone is accused of committing a crime, as far as the law is concerned it is assumed they didn't do it and that the burden is always on the State to prove that he did do it?

A: Yes.

Q: You accept that?

A: Um-hum.

The court then asked the juror two questions to learn whether her deliberations would be affected; she denied any effect. Neither party challenged Ms. Patterson for cause. She was peremptorily excused by the State the following day.

(f) *Ms. H. Johnson*

Hilda Johnson knew about the case from the radio and newspaper but did not connect defendant's name with it until she got to court.

[THE COURT] Q: Okay. What did you read in the paper and hear on the radio or what do you remember?

[THE JUROR] A: About the happenings.

Q: When you say the happenings, what details do you remember?

A: About various—uh, things he was connected with; them finding the people that were buried.

Q: But you didn't—you didn't associate that with the name Biegenwald?

A: No.

Q: Biegenwald meant nothing to you?

A: No.

 * * * * * * * *

Q: Okay. So that do you remember any of the details of the background of that person from reading the newspapers or hearing it on the radio?

A: I don't know about the background.

The trial court then asked the juror two questions to learn whether her deliberations would be affected, but she denied the publicity would have any effect. Neither the State nor the defendant challenged the juror for cause, although the court did not specifically ask whether either wished to challenge for cause. In fact, the defendant did not challenge anyone for cause after the 36th juror was accepted. When Judge McGann asked for challenges, each party simply alternated making their peremptory challenges; until that time, every challenge for cause by the defendant had been denied. At side bar, both the State and the defendant requested further questioning about the death penalty and the juror's statement about "finding bodies," respectively. The Court cut defense counsel off for "being nonsensical" when he asked for a ruling between a prior juror's statement about "mass murders," which prompted further questions and the court's refusal to ask more questions after this juror mentioned "finding bodies." Defendant peremptorily excused Ms. Johnson later that day.

### (g) *Ms. Hugo*

Michelle Hugo actually served on the jury. She said knew nothing about the defendant before she appeared for jury duty but learned details from other prospective jurors.

[THE COURT] Q: After you came here Monday morning did any of the jurors before they were assembled and before they sat down, did any of the jurors talk about this case?

[THE JUROR] A: There were a few. I have heard mentioned that name, that [ ] they heard the trial they were supposed to be picking jurors, whatever. They never—none of them talked to me about [ ] the trial itself, what had happened or anything. They just mentioned the name and then the only thing I heard was what you had told when we were in the other room. And then of course [ ] that roused up people and—

Q: What I told you when you were in the other room, and I roused up people?

A: Um-hum.

Q: What was that?

A: When you told what the case was about.

 \* \* \* \* \* \* \* \*

Then I guess, you know, they started talking about it.

Q: After I told them not to talk about it they talked about it?

A: Yes, yes.

Q: What did they say?

A: Well, they all had different stories. None of them—I don't think any of them really had—[ ] had it all straight or anything. Everybody [ ] was talking about different things. One person heard this. One person heard that. They never—the stories really—never really matched or anything.

Q: And this was in the other courtroom when you were waiting there?

A: Yes.

Q: What did you hear?

A: [ ] One girl was saying how she [ ] was reading about it in the newspaper, whatever, and a couple of us had said [ ] well, we don't know anything about it [ ] and being that we are not supposed to talk about it[ ] and she said, "Well, I heard this, that, and the other thing," "about this girl and this girl." And [ ] it was just—and then it was like—"Well, I'm not to say anything so I won't say anything."

Q: Can you identify that person for us?

A: Um—Ruth—I don't know her last name.

Q: Ruth?

A: Yes.

Q: Okay. And what was she saying that you recall?

A: Um, she said something about how he [ ] how he had killed them. How he had gone about like luring them or [ ] getting them to go with him or—and,

ugh—oh—and about a friend of his or something, [ ] how he went to the police or whatever and told them about what he knew.

Q: Was this Ruth the only one who was talking in that fashion or were others giving little tidbits?

A: There were others, others that knew it, yes.

Q: I'm sure there were others that knew about it. What were they saying about it?

A: Ugh, they were more or less comparing what they read. They were— "Well, I read this newspaper and this newspaper said this," and, "Well, I read this one. This one said this." And they were just like comparing what they knew between each other.

Q: Did any of those notes that they were comparing or any of the little information that they were contributing have anything to do with Mr. Biegenwald's background?

A: No no.

Q: Is there anything that you heard them that gave you a mind set which you feel might affect your ability to judge this case fairly on what you hear in this courtroom?

A: No. Because, um, I very rarely go by what the newspapers will say before a trial. I don't believe in prejudging people. I don't—I very seldom pick up a newspaper, because all different newspapers have different stories and it would just—it wouldn't [ ] allow you to think clearly if you were to go by what everybody says, because nobody really has the true facts, the true honest facts about the trial or anything.

Q: Let me ask you this: This case that we are trying concerns one incident. Apparently what some of the people were saying there referred to other incidents.

A: Yes.

Q: Do you think the fact that there was reference to other incidents might have a capacity to affect your judgment sitting on this case?

A: No, because you are just dealing with one. The other ones aren't—don't have anything to do with this case.

Q: How extensive would you say were these discussions of Ruth or whoever else was comparing notes with Ruth?

A: They—they brought the other things into it.

Q: How long did that last?

A: I guess until—well, that was just the first day when we were sitting by ourselves. After we had found out what the case was about and, um, after a couple of us who hadn't known about what was going on had [ ] said, "Ruth, you're not supposed to talk about it," whatever, I think she got the idea too, [ ] not to talk about it or whatever.

Q: She was the principal big mouth from what you say?

A: Where I was sitting.

Q: All right. But you feel that whatever you heard you would be able to put aside and not allow to affect your judgment if you sit as a juror?

A: That's right.

Neither party challenged Ms. Hugo for cause nor peremptorily excused her.

(h) *Ms. Kelly*

Kathy Kelly knew nothing about Mr. Biegenwald until she read the article in the *Asbury Park Press* on Sunday, November 13, 1983.

[THE COURT] Q: Now, what knowledge did you have of the case, when did you acquire the knowledge and from what source?

[THE JUROR] A: It was Sunday from the Asbury Park Press. Someone called me up and said that they are picking jurors for a murder trial and I laughed because I hadn't heard about anything. So then my mom made it a point to stick the paper in front of me so I would read the article so that I wouldn't be considered basically. So I read it briefly, but I didn't—I always sort of pass over that information in the paper anyway.

Q: Your mother put the paper in front of you.

What do you remember reading in the paper?

A: I read that, um—that Mr. Biegnewald supposedly talked to somebody, in the Asbury Park Press, and then later they found the body of other things that had happened. But of the case at hand, it really didn't go into that much.

Q: Did it go into at all the background of Mr. Biegenwald?

A: Something that—something about 1958, about he had been in prison at one time.

Q: Do you recall for what?

A: For murder of a District Prosecutor or something like that.

The trial court then asked Ms. Kelly two questions to learn whether her deliberations would be affected by what she knew. She said no and volunteered that she believed everyone was innocent until proven guilty of the particular crime, and that depended on what was presented. The court then continued his questioning.

Q: All right. Also in the newspaper was there something about other—other things?

A: There were about others, but I didn't want to read the rest and I didn't. I sort of stopped reading it.

Q: Other what?

A: There were about other murders that were—that was going to be tried succeeding this jury.

Q: Okay. Then you are aware there are other charges of murder against Mr. Biegenwald?

A: Right.

Q: Do you feel that if you were a juror on this case judging this case, that that information about his background might affect your ability to judge this case?

A: Um, I don't feel it will, but—I—I guess—nobody knows exactly how they are going to feel when they start hearing testimony.

Q: No one ever does. But what we are asking is an honest self-appraisal.

A: No, I don't think it is going to affect me.

Q: The fact of Mr. Biegenwald's prior conviction—I think I covered that a little bit—but if I didn't—

A: Did that affect me?

Q: Right.

A: No.

Q: You could say, "It is something we will put aside and we will concentrate on what is here," is that it?

A: Yes.

Q: You think so? You honestly think you can do that?

A: The only reason why I am hesitating at all is just because of—I guess, as you say, the inconvenience of staying here through this and having my boss getting upset with me.

In regards to being a fair and honest juror, I think I could be able to sit through the information that is given at this trial and not—not listen to anything else.

Q: After you came here Monday when the jurors were assembling and getting seated and organized and that sort of thing, did any of the other jurors talk to you about this case or did you overhear any of the other jurors talking about the case?

A: Everyone—I really doubt if anybody—I can't speak for other people, but everybody was speaking about it.

Q: All right.

A: Speaking about what they heard. Somebody wanted to speak to me today and I said, "Leave me alone. The judge said not to talk about it."

Q: Okay. That's helping. But in the assembling process—now we are concentrating back then on Monday.

A: People were speaking about, "Did you see the guard on top of the building?" when we were walking in in the morning.

Q: Right.

A: And then reading—somebody had read the papers the other night.

Q: Do you recall any details that you overheard them discussing?

A: Um, one person had read the article about the first juror saying that they believed a life for a life.[16] Another person had just discussed the processing, coming into the courtroom and out of the courtroom.

---

[16]The *Asbury Park Press* article on Tuesday, November 15, 1983 reported, *inter alia,* that the very first juror questioned on *voir dire* said she believed in

Q: I'm looking for any detail about the background of the case, the underlying facts of the case, that sort of thing.

A: Actually nobody really wanted to talk about that part. They were just talking about whether we were going to go through the picking process.

Q: Then remember you were part of a general panel pool available for trials.

As you sat there did anyone talk to you about this case or did you overhear anyone talking about the case? And we are talking not, just, you know, the cases going on in the courthouse, but details about the incident itself.

A: Um, not actually about this case. It was more about—about the other cases, about having people—the proceeding cases that are going to come up about having bodies found in his mother's lawn or something.

Q: · Do you recall whether they were jurors who were just in that general pool or were they maybe persons who had been excused as jurors from here and had gone back?

A: No. It was everybody—I'm sorry. It was the people in the general pool before they had come.

Q: All right. Again is there anything that they told you, all these little tidbits that may have been passed around, whatever they may have been, that you feel would accumulate and add to whatever other information you had and then have the capacity to affect your judgment as a juror?

A: Um, my honest feeling is that for this case, the stuff for this individual case, for what I read and what I heard, there wasn't any evidence that—I mean, it wasn't substantial that he was the killer in this case; but it was my feeling that after so many—incidents, it is highly probable he is guilty of one of these crimes.

Q: How about highly probable of being guilty of this crime?

A: From what I read and what I talked about this crime, he talked to somebody and then there was a body. But I saw no connection in between.

Q: All right. As far as a connection is concerned, whether there is or is not, do you feel that you could sit as a juror and listen to all the evidence that is presented in this case and then make that determination, is or is not, based on what you hear in the courtroom and disregarding anything else you may have heard or read.

A: Yeah, I feel so.

Q: It is important to us that you give us that honest feeling. You understand that, right?

A: Yeah.

No one challenged Ms. Kelly for cause; she was peremptorily excused by the State later that day.

---

"a life for a life." She was excused because she said she would automatically vote for the death penalty.

#### (i) *Mr. Revill*

Bertram Revill stated in his jury questionnaire that he, recognized the defendant's name.

[THE COURT] Q: Now would you tell us what information, what knowledge you had of the case before you got here on Monday?

[THE JUROR] A: Uh, just that the girl was missing from the Boardwalk in Asbury Park and that they had found the body a couple of days later, and about the bodies in Staten Island.

Q: Okay. And Mr. Biegenwald's name in connection with that?

A: Right.

Q: The Staten Island connection, did that have any connection in your mind with your sister working over in Staten Island?

A: No, sir.

Q: And did you read that in the newspapers, get that information from the newspaper or from television or from a combination?

A: A combination.

Q: What papers would you have read do you think?

A: It would be the Star Ledger.

Q: And then maybe television, too?

A: Right.

Q: Okay. The fact that you mentioned, quote, bodies in Staten Island—we are dealing with one case—do you think that the plural, the bodies that you mentioned might affect' your judgment sitting on this case?

A: No, sir.

The trial court then asked Mr. Revill five questions to learn whether he could be fair and impartial despite what he had heard or knew about the defendant. Mr. Revill said that "I think so" twice, and twice said "no" when asked if his judgment would be affected. Then questioning continued.

Q: Once you got here as a juror and all the jurors were coming together in the assembly room downstairs and before you were kind of organized into groups, did any of those jurors talk with you about this case or did you talk with any other jurors about this case?

A: There has been mention of it.

Q: All right. Did people mention it directly to you or did you overhear that, or both?

A: Both.

Q: Okay. What was mentioned to you?

A: Just basically that the case was being held here.

Q: Okay. What did you mentioned to anybody else?

A: Just, you know, basically what I knew.

Q: Did you exchange that information that you just told us about with other jurors?

A: Oh, yes.

Q: Did you say like, "Oh, this case has to do with a girl disappearing from the Boardwalk in Asbury Park"?

A: Yes.

Q: "And bodies in Staten Island"?

A: No.

Q: You didn't mention that?

A: No. It never came up.

Q: Do you recall any information regarding Mr. Biegenwald's background?

A: Yes.

Q: What do you recall about that?

A: That he had been in prison prior.

Q: For what?

A: For murder.

Q: Did you read that in the newspapers?

A: Yes.

Q: You didn't get that information here?

A:

Q: Do you think that fact might stick in the back of your head and affect your judgment if you sit as a juror on this case?

A: No, sir.

Q: Do you think you could really put that aside and again stick with what you hear in this courtroom?

A: Yes, sir.

Q: We are talking about jurors kind of talking among each other. You are talking about what people said to you and what you said to other people.

 Did you ever overhear other jurors discussing, talking, whatever you want to say, about the case?

A: Yes, sir. I just mentioned it.

Q: Okay. I thought it was you and another juror.

A: You said overheard or talked.

Q: Overheard, okay. And did you overhear any details being exchanged among the jurors?

A: Uh, no, sir.

Q: Just generally they knew this was a case. There was a murder case or some sort of big case they are here for?

A: Yes.

 * * * * * * * *

Q: Then as far as you are concerned, from all that you have heard, whatever input you have, do you feel that if you sat on this case you could give a fair shake, be fair and impartial both to Mr. Biegenwald and to the State in coming to your decision?

A: I think so.

Q: And put aside whatever gossipy stuff or whatever you heard?
A: Yes, sir.
Q: Including those other items that we talked about?
A: Nodding affirmatively.)

 \* \* \* \* \* \* \* \*

A: Right.
Q: Do you think that that basic perception about the presumption of innocence as it is called would be affected in your mind by the fact that you know that he had a prior conviction of murder?
A: Can you repeat that?
Q: He is presumed to be innocent when he goes to trial here.
A: Yes, sir.
Q: You understand that.
A: Right.
Q: Now, do you think the perception you have of that principle, the presumption of innocence, would be affected because you know that he had a prior conviction of murder?
A: No, sir.
Q: You could keep that completely separate and apart?
A: Yes, sir.
[THE COURT]: Okay. All right. Then I am satisfied and Mr. Revill can then take chair number....

Mr. Revill was peremptorily excused by the defendant as soon as he was accepted by the court.

*For affirmance* —Chief Justice WILENTZ, and Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For reversal* —Justice HANDLER–1.